**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JAMES and SANDRA LINDQUIST, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-06-1975 |
| | § | |
| THE CITY OF PASADENA, TEXAS, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

James and Sandra Lindquist sued the City of Pasadena, Texas, challenging the City Council's denial of their appeal from the City's refusal of their application for a license to operate a used-car sales lot on property they owned. The City Council denied the appeal under a municipal ordinance requiring used-car lot operators to have a license. The ordinance required each newly licensed lot to be located a certain distance away from an existing licensed lot and from residential areas or subdivisions. The Lindquists alleged that the denial of their license-application appeal violated the Due Process and Equal Protection Clauses of the United States and Texas Constitutions. The alleged equal protection violation was based on their claim that they were a "class of one" and that the City had intentionally and arbitrarily treated them differently from other, similarly situated appellants. The City moved to dismiss the Lindquists' original complaint for failure to state a claim. (Docket Entry No. 9). This court granted the City's motion, holding that the Lindquists failed to state a class-of-one equal protection claim in the absence of any allegation that the City's actions were motivated by "illegitimate animus or ill will." (Docket Entry No. 22). The Lindquists acknowledged that their lot did not meet the ordinance distance requirements and did not qualify for

a license.  They alleged that while the City enforced the ordinance's distance requirements against them, the City did not enforce the requirements against other used-car lot license applicants whose property also failed to comply.  This court dismissed the equal protection claim, relying on Fifth Circuit precedent requiring a plaintiff making selective-enforcement allegations to plead that "an illegitimate animus or ill will motivated [its] intentionally different treatment from others similarly situated and that no rational basis existed for such treatment."  *See Shipp v. McMahon*, 234 F.3d 907, 916 (5th Cir. 2000), *overruled on other grounds by McClendon v. City of Columbia*, 305 F.3d 314, 328–29 (5th Cir. 2002) (per curiam).  This court dismissed the due process claim because it simply recast the equal protection claim in substantive due process terms.  (Docket Entry No. 22).  Finally, this court dismissed the "unbridled discretion" claim because the ordinance set out the criteria for City officials to use in deciding whether an applicant is entitled to a license and for City Council to use in deciding an appeal.  (*Id.*).

The Fifth Circuit upheld the dismissal of all the Lindquists' claims except the class-of-one equal protection claim.  *See Lindquist v. City of Pasadena*, 525 F.3d 383, 387 (5th Cir. 2008).  Citing a case distinguishing between a claim arising from "the denial of zoning permits" and a claim arising from selective enforcement of ordinances or other laws in the class-of-one context, *Mikeska v. City of Galveston*, 451 F.3d 376 (5th Cir. 2006), the Fifth Circuit held that the Lindquists' equal protection claim did not sound in selective enforcement but rather challenged an adverse zoning decision.  *Lindquist*, 525 F.3d at 387.  Under *Mikeska*, a class-of-one plaintiff challenging the denial of a zoning permit need not allege ill will or impermissible animus, but must show a lack of a rational basis.  A class-of-one plaintiff challenging a license denial on the basis of a selectively enforced ordinance must allege ill will or animus as well as the lack of a rational basis to state a

2

claim. *Mikeska*, 451 F.3d at 381. The Fifth Circuit cautioned that although dismissal for failure to allege ill will or animus was not warranted, on remand, to "prevail on the [class-of-one] claim, the Lindquists must carry the heavy burden of 'negativing any reasonably conceivable set of facts that could provide a rational basis' for their differential treatment." *Lindquist*, 525 F.3d at 387.

Following remand, the parties engaged in discovery. After discovery ended, the Lindquists moved for partial summary judgment, arguing that the City has a policy or custom of using unbridled discretion in deciding appeals from license denials, making the ordinance unconstitutional because the City does not consistently apply the licensing requirements and "mal-administers" licensing appeals. The Lindquists seek damages and an injunction directing the City to issue them an unrestricted license to sell used cars at the lot they own. (Docket Entry No. 55). The City responded, (Docket Entry No. 65), and the Lindquists replied, (Docket Entry No. 68). The City argues that the dismissal of the Lindquists' unbridled-discretion claim was affirmed on appeal; that only the class-of-one equal protection claim remains for this court to consider; and that as a matter of law, the City is entitled to summary judgment dismissing that claim. The City moved for summary judgment, asserting that based on the undisputed facts in the record, the Lindquists have failed to meet their "heavy burden" to show no rational basis for the denial of their appeal from the City's refusal to issue a license while other appeals were granted. (Docket Entry No. 59). The Lindquists responded, (Docket Entry No. 67), the City replied, (Docket Entry No. 69), and filed a supplemental reply, (Docket Entry No. 71).

Based on a careful review of the motions, responses, and replies, the record, and the applicable law, this court denies the Lindquists' partial summary judgment motion and grants the

City's summary judgment motion.  Final judgment is issued by separate order.  The reasons for these rulings are explained in detail below.

## I.    Background

The Lindquists are residents of Pasadena, Texas.  They have a dealer's license to sell used cars.  For the last fifteen years, they have operated a dealership known as "Professional Auto" at 2602 Preston Road in Pasadena.  Their business experience was not a factor in the license denial at issue in this case.  The City's former Planning Director, Tim Tietjens, testified in his deposition that he was not aware of any "issue with the Lindquists that would taint their image or reputation in the community."  (Docket Entry No. 55,  Ex. B, Deposition of Tim Tietjens, at 18–19).

By 2003, the City of Pasadena had more than eighty licensed used-car dealerships.  (Docket Entry No. 59, Ex. A).  The City's Motor Vehicle Dealers Ordinance was amended in 2003 to require used-car dealers to obtain a license for each location at which they sell cars.  The amended ordinance was intended to curb the growth of new used-car dealerships.  PASADENA, TEX., CODE OF ORDINANCES ch. 22, art. II, § 22-1 *et seq.* (2003).  The preamble to the amendment states that it was passed "to implement standards to govern and promote the conservation and stabilization of property values, provide adequate open space for natural light and air, lessen congestion on streets and highways, serve the needs of the motoring public and minimize impacts on lesser intensity uses."  (Docket Entry No. 59, Ex. B).  The preamble explains the City's desire to "avoid and mitigate the secondary effects" associated with car dealerships that are "detrimental to the public health, safety, and welfare."  (*Id.*).  These effects include "nighttime glare and light pollution impacting adjacent residential communities; thermal heat gain due to expansive parking and display area needs; production of point and non-point source pollution which flows into storm water systems of the City,

and eventually discharges in the natural waterways; [and] the need for protection of motor vehicle dealers and the public from undesirable criminal elements trafficking in the dismantling and conveying of stolen vehicles and/or parts thereof." (*Id.*).  The City Council concluded that the licensing of each used-car dealership location would enable the City to further the purposes and goals of the ordinance.

The amended ordinance requires a newly licensed used-car lot location to be a minimum distance from any currently licensed car dealership and from any residential area or subdivision. The relevant ordinance provisions are as follows:

> Each new license location is required to be a minimum of one thousand (1,000) feet from any existing license location as measured from nearest property line to nearest property line.

PASADENA, TEX., CODE OF ORDINANCES ch. 22, art. II, § 22-22(c)(16) (2003) (the "1,000-foot rule").

> There shall not be issued a new license for the operation of a used car lot within one hundred fifty (150) feet of the lot lines of a residential area or subdivision.

*Id.* § 22-22(c)(4) (the "150-foot rule").  A grandfather clause permits a license to issue even if the 1,000-foot or the 150-foot rules are not met if certain conditions are shown, including that the dealership has been operating at the same location and continuously licensed for a minimum period, with no more than a sixty-day interruption of sales activity.  The 1,000-foot rule provision also allows licenses for selling "classic" cars on a lot that falls under the rule, even if the applicant's lot does not meet the ordinance distance criteria.

Under the ordinance, a used-car dealership license application is first reviewed by a City

building official.  If that official denies the application, the applicant may appeal to the City Council.

*Id.* § 22-29.  The appeal provision states:

> The hearing before the council shall be de novo and the applicant
> shall have the burden of proving that he is entitled to the license.  At
> such hearing, the council shall have the right and authority to
> consider the information obtained by the chief of police . . . when
> investigating the applicant and also any report or statement of facts
> prepared by the city building official in connection with the
> matter. . . . After such hearing, the council shall decide, by motion,
> whether or not the license applied for shall be granted or refused.

*Id.* § 22-29(b).

In 2003, the Lindquists wanted to expand their car-dealership operation beyond the Preston

Road lot.  They considered two locations, one at 4545 Spencer Highway and the other at 4646

Spencer Highway.  The 4545 Spencer Highway location was developed for and had been used as

a car dealership; the lot at 4646 Spencer Highway was constructed for and was operated as a gas

station.  The Lindquists talked to City officials about purchasing one of these two lots for a used-car

dealership.  The officials told the Lindquists that both lots were ineligible for a used-car dealership

license because both violated the 1,000-foot rule and one also violated the 150-foot rule.  The 4646

Spencer Highway location was within 1,000 feet of an existing used-car dealership, Big Horn Auto

at 4717 Spencer Highway.  The 4545 Spencer Highway location was within 1,000 feet of two

existing used-car dealerships and within 150 feet of a residential area.  City officials told the

Lindquists that although the 4545 Spencer Highway location had previously been used as a used-car

lot, it did not qualify for the grandfather clause in the ordinance.  The Lindquists bought the lot at

4646 Spencer Highway in 2003, knowing that it did not meet the ordinance requirements for a used-

car lot license.

On October 9, 2003, the Lindquists applied for a used-car lot license for the 4646 Spencer Highway property.  (Docket Entry No. 59, Ex. D).  City officials denied the application on October 27, 2003.  (*Id.*).  After their application was denied, the Lindquists met with two City Council members and with the City Director of Planning to discuss other possible uses for the lot at 4646 Spencer Highway.  (Docket Entry No. 59, Ex. G, Deposition of James Lindquist, at 14:3–18).  James Lindquist agreed with the suggestion that he and his wife use the lot to sell boats, motorcycles, travel trailers, golf carts, ATVs, classic cars, and classic trucks, for which they could obtain a "limited use" license under the ordinance.  (*Id.*).  On January 30, 2004, the City issued a "limited use" dealer license to the Lindquists to sell these types of vehicles at the 4646 Spencer Highway location.  The Lindquists opened "Pasadena's Toy Store" at the location to sell boats, motorcycles, travel trailers, golf carts, ATVs, classic cars, and classic trucks.  (*Id.*). The dealership still sells such merchandise.

In November 2003, Keith and Tammy Nielsen, who owned and operated a used-car sales business under the name "Kar-Mart," bought the lot at 4545 Spencer Highway.  City officials denied Kar-Mart a used-car dealer license for 4545 Spencer Highway because the lot violated the 1,000-foot rule in the amended ordinance.  The 150-foot rule was not a basis for the denial.  The Nielsens appealed the denial of their license application to the City Council.  The hearing on May 18, 2004 was attended by Mayor Pro Tem Jim Barker and City Council members Don Harrison, Jack Douglass, Jerri Neely, Bill Welch, James Guthrie, Dana Philibert, and J.J. Isbell.  Mayor John Manlove was absent.  The hearing was open to the public and the Lindquists were present.

At the beginning of the appeal hearing, the City Planning Director, Tim Tietjens, stated: "This is not a variance request in which someone's coming forward and seeking administrative relief around an ordinance.  It is a section in the ordinance that's allowed those who have made such

7

application.  It is of public record and everyone that gets rejected is able to make the same appeal.

Each appeal stands on its own merits.  Council has discretion to grant or refuse as you deem

appropriate."  (Docket Entry No. 59, Ex. C, Transcript of May 18, 2008 City Council meeting, at

4:16–25).  Tietjens stated that he would explain the facts and the reasons behind the City's

determination and then allow the Nielsens time to speak.  Tietjens told the Council that the previous

owner of the lot at 4545 Spencer Highway, Gulf Coast Truck Center, was issued an auto-dealer

license in 1999.  (*Id.*, at 5:4–7).  Tietjens stated that "at some undetermined point in time, Gulf Coast

Truck Center formally closed operation and ceased selling vehicles on the lot."  Mail was returned

from that address after September 29, 2003.  (*Id.*, at 6:3–11).

After Tietjens gave this background, the Nielsens addressed the Council.  The Nielsens

argued that the lot at 4545 Spencer Highway fell under the grandfather provision; that the lot was

last used as a licensed car dealership; that the prior owners had spent approximately $800,000 to

improve the lot for the specific purpose of operating as a car dealership; and that the lot was so

committed to use as a car dealership that it had no other practical purpose.  (*Id.*, at 11:11–20;

13:23–25).  The Nielsens also argued that it would be better to have the lot function as an active

business producing tax revenues rather than stay a vacant lot.  (*Id.*, at 13:25–14:3).  Because the

4545 Spencer Highway location had been vacant for a period, some Council members rejected the

suggestion that the lot met the grandfather provision requirement that there be no more than a 60-day

interruption in sales activity.  Councilman Harrison stated that he felt the 60-day rule was

unconstitutional but that the Council was bound to follow the ordinance and deny the Nielsen appeal

because the lot had been vacant for longer than 60 days.  Keith Nielsen pointed out that the previous

owner, Gulf Coast Truck Center, had been granted a renewed used-car dealer license in June 2003.

8

Nielsen stated that he obtained a copy of that license from the City before buying the property.   He brought a copy of the license, which was valid until June 2004, to the meeting.   Nielsen noted that the ordinance did not define the term "sales activity."   He argued for a broad definition, pointing to the Texas Transportation Code provision that to maintain an active State license to sell cars, a licensee must sell at least five cars per year.   (*Id.*, at 28:3–18).   Nielsen asserted that there was evidence of sales by Gulf Coast in the previous year and that Gulf Coast's dealer license had not been revoked by the State for inactivity.   Nielsen had submitted to City officials title transfers and title registrations that Gulf Coast had completed for vehicles sold since the June 2003 license renewal.   Nielsen argued that the City's desire to limit the number of new dealerships in an area would not be affected by granting a used-car dealership license for 4545 Spencer Highway because that location had been an auto dealership for years.

Mayor Pro Tem Barker observed that "there's not much use for that lot the way it is other than a car dealership.   The people who moved out, if they – if they kept their license up to date and their license is still in effect, even though it's vacant, it looks to me like – it looks like we could put that to good use with a good car dealership right there." (*Id.*, at 27:12–19).   Councilman Guthrie stated that the property at 4545 Spencer Highway was developed as a "showcase lot" and would not be suitable for any other use.   Tietjens stated that the lot was the most recent newly built car dealership in Pasadena.   Councilman Harrison stated that although the lot was vacant, the City was "getting taxes.   But we'd get more taxes if it was put in use some way." (*Id.*, at 39:24–25).   Councilman Welch said, "I think each case stands on its own.   Each request for its variance stands on its own, and this has no dealing on anybody else. . . .   I think this property is best suited as a car lot and I think we need to go ahead with it and allow this variance." (*Id.*, at 41:23–42:1).

Councilman Guthrie asked Tietjens if the Nielsen lot met all ordinance requirements other than the 1,000-foot rule.  In response, Tietjens stated that "[t]o my knowledge, it meets every code but the 1,000 feet." (*Id.*, at 43:4–5).  Guthrie asked Tietjens what would happen if the Nielsens' appeal was denied and whether they could request a variance.  Tietjens responded, "Well, the appeals process is defined in this ordinance.  It would be a lawsuit, I'm told." (*Id.*, at 43:14–16).

Councilman Isbell, who voted against the Nielsens' appeal, noted that during the debate on amending the ordinance, Gulf Coast Truck Center was specifically mentioned as a lot that would not meet the 60-day requirement in the grandfather clause because the lot had been vacant for months.  Isbell continued: "[W]e all voted . . . unanimous on this ordinance knowing all of those things at the time.  And to me, it just – it just opens up a can of worms that this is not a variance issue.  This is an appeal issue.  And if this council goes against an ordinance that we passed saying that, no, even though we passed it, these issues we can overrule and grant a license.  I think that that's unfair to those folks that are in the business that do have to comply, and it is a struggle for me." (*Id.*, at 46:4–15).

The City Council decided to grant the Nielsens a used-car dealership license for the lot at 4545 Spencer Highway.  The vote was five to three.  The day after that decision, the Lindquists reapplied for a used-car dealer license for 4646 Spencer Highway.  City officials again denied the license application on the basis of the 1,000-foot rule.  The Lindquists appealed.  At the appeal hearing held on June 15, 2004, the City Council members participating were Mayor Manlove, Don Harrison, Jack Douglass, Bill Welch, Jim Barker, James Guthrie, Dana Philibert, and J.J. Isbell.  Councilmember Neely was absent.  Tietjens, the City Planning Director, began the meeting.  "This appeal has been requested in accordance with Chapter 22-29(b) of the Pasadena Code of Ordinances.

10

This is an actual appeal of a rejection to Council.  It's not a variance, as such.  Each appeal stands on its own merits.  Council has discretion to grant or refuse."  (Docket Entry No. 59, Ex. D, Transcript of June 15, 2004 City Council meeting, at 4:18–23).  Tietjens explained that the Lindquists' application for a used-car dealer license for 4646 Spencer Highway had been rejected, but that they had received a license to sell classic cars, boats, and motorcycles.  Tietjens told the City Council that the Lindquists had opened "Pasadena's Toy Store" in January 2004.  Tietjens noted that the lot at 4646 Spencer Highway did not comply with the ordinance because there were two licensed competitors within 1,000 feet — Kar-Mart at 4545 Spencer Highway (235 feet away) and Big Horn Auto at 4717 Spencer Highway (390 feet away).  (*Id.*, at 6:3–7).

Sandra Lindquist addressed the City Council.  She argued that for purposes of the 1,000-foot rule, the City should measure "from side lot line to side lot line."  (*Id.*, at 7:16–17).  Lindquist asserted that "[o]ur lot, too, has been meant for the sole purpose of cars being on it."  (*Id.*, at 7:11–12).  She continued: "We bought this property with the intent to sell automobiles.  Please don't restrain us from growing with Pasadena.  Thank you in advance for all your fairness."  (*Id.*, at 8:7–9).  Councilman Harrison asked Tietjens "how do you define the distance from a property line?"  (*Id.*, at 17:1–2).  Tietjens, the City Planning Director, stated that the ordinance requires the distance to be measured "from the nearest property line to the nearest property line."  (*Id.*, at 17:5–9).  Councilwoman Philibert asked Tietjens for clarification as to why the Council was not being asked to decide a variance request.  The following exchange occurred:

> Ms. Philibert:  I want to make sure I understand.  Because we've thrown around the term "variance" a lot over the last three years and with frustration by some members that we allow for variances to our ordinances for a variety of reasons.

Mr. Tietjens:    Because the ordinance itself has specific language on how to address a denial.  It is not – it specifically outlines what you're supposed to do in that Section 22-29(b).  And it outlines it in the ordinance and describes the  conditions that the – basically the burden of proof has to be on the applicant.

Ms. Philibert:    Okay.  So for us to allow someone to open a used auto lot in any sort of setting that fits this criteria, we would actually have to change the ordinance; is that correct?  I mean, we would have to modify the ordinance or change the distance, to change the timeline that Councilman Harrison's concerned with for it to be accurate?

Mr. Tietjens:    To amend the ordinance to allow the dealership to open?

Ms. Philibert:    Uh-huh.  I mean, if we —

Mr. Tietjens:    If there's a reject – yes.  In order for any dealership to open a variance would be required from that standpoint.  But an appeal, no, a variance would not be required.

Ms. Philibert:    So can they receive a variance prior to the denial?  I mean, I don't mean to talk circular, but the problem is I think some of the confusion that we have is the law is the land – is the law of the land right now. . . .

Mr. Tietjens:    It's an appeal process.  Yes, it's specifically not a variance.  Because a variance renders the code, due to some unique configuration of a site, impractical to implement a specific site condition as opposed to a more general requirement such as a distance requirement.

(*Id.*, at 12:7–14:3).

Councilman Isbell stated that it was "cut and dried" and "black and white" that the Lindquists' lot at 4646 Spencer Highway violated the 1,000-foot rule of the ordinance.  He stated that, just as with the Nielsens' appeal, he could not support approving the license because the applicants did not meet the ordinance requirements; if Council members did not like the requirements, they should change the ordinance.  (*Id.*, at 14:20–15:6). Sandra Lindquist asked, "how can we change the wording so that it reads side lot line to side lot line instead of nearest property

line?"  (*Id.*, at 15:11–13).  Councilman Isbell responded: "Well, I guess the ordinance would have

to be changed.  But as the current ordinance stands, you know, it doesn't say that."  (*Id.*, at

15:14–16).  Councilman Douglass stated that he believed it would be unfair to deny the Lindquists'

appeal, given that both the Lindquist lot and the Kar-Mart lot violated the ordinance.  (*Id.*, at

8:16–9:8).  Councilman Douglass stated, "By allowing Keith Nielson [sic] to violate our Used Car

Dealer Ordinance and turning around and not allowing the Lindquists the same courtesy sounds like

favoritism."  (*Id.*).  Councilmembers Barker and Welch explained that they would vote to deny the

Lindquists' appeal because these were different circumstances and a "totally different situation"

from the Nielsens' lot.  Barker stated: "All appeals or variances are not treated the same, and we do

have a right to do that.  We have the right to overrule an appeal.  We have the right to make a

variance."  (*Id.*, at 16:2–5).  Barker and Welch both emphasized the differences between the

Nielsens' lot and the Lindquists' lot.  While the Nielsens' lot had been developed and improved

specifically as a used-car sales lot, the Lindquists' lot had been operated as a gas station and would

require construction and improvements to make it a car dealership.  (*Id.*, at 16:6–21).

The City Council voted unanimously to uphold the denial of the Lindquists' license

application.  The Lindquists filed this lawsuit on June 12, 2006.

In August 2006, the City Council granted an appeal from the denial of a used-car dealer

license for a lot at 2801 Preston Road owned by Joe Chambers.  The lot had been operated as a used-

car dealership until July 2004, when it was briefly operated as a check-cashing business, then

became vacant.  Chambers bought the property on July 1, 2005.  He applied for a used-car

dealership license on April 26, 2006 and was denied because the lot did not comply with the 150-

foot rule.  The 1,000 foot rule was not a basis for the denial.  Chambers appealed to the City

Council.  The City Council members present at the hearings, held on July 25, 2006 and August 15, 2006, were Mayor John Manlove, Don Harrison, Jack Douglass, Jackie Welch, Jim Barker, James Guthrie, Dana Philibert, J.J. Isbell, and Ralph Riggs.  (Docket Entry No. 59, Exs. E, F).

As with the two previous appeal hearings under the ordinance, Tietjens began the meeting by explaining why the application was denied and how the appeal process worked.  He stated: "You can appeal a rejection if it's not a variance, as such.  Each appeal stands on its own merits.  Council does have the discretion to grant or refuse, as you deem appropriate."  (Docket Entry No. 59, Ex. E, Transcript of July 25, 2006 City Council meeting, at 4:4–7).  Tietjens stated that "several single family residential units are within 150 feet" of the 2801 Preston Road lot and "[t]hat's really the only issue that Mr. Chambers is dealing with."  (*Id.*, at 5:4–11).  Tietjens explained that the property was previously used as a used-car dealership called Crescent Motors.  "It ceased operation on some unknown date. . . . We do know, however, it was before 7/23 of '04. . . . [I]t became a check cashing establishment at that point in time."  (*Id.*, at 6:1–7).

In his presentation to the City Council, Chambers asserted that before he bought the 2801 Preston property, he was told by a City official named Warren Escovy that he could put a used-car lot at that location.  Chambers told the City Council that he knew the lot had previously been used for a used-car dealership and that he would not have bought the property if he did not think he could operate a used-car dealership there.  After the City officials rejected his license application, Chambers was unable to sell the property because every interested buyer wanted to put a car dealership on the lot.  Chambers explained that he had obtained the consent of the closest residential neighbor to reopen 2801 Preston Road as a car dealership.  He had not spoken with any other neighbor.

14

In response, Councilman Isbell stated: "The bottom line is that the property doesn't meet ordinance. . . . But my problem is, if we had a city employee that told Mr. Chambers that it did and then based on that conversation he went out and bought this property . . . I'm not sure the City doesn't have some liability if we don't allow this, based on the actions of the employees." (*Id.*, at 24:9–14; 47:9–11). Councilman Harrison stated that he heard a rumor that none of the residents within 150 feet objected to opening a car dealership there. Councilman Barker stated, "I feel like if there was no objection [from the neighbors], even though it is against the ordinance . . . that would certainly help me to determine whether to vote for this variance or not." (*Id.*, at 48:7–12). Mayor Manlove followed up by stating: "If we had maybe letters from some of the residents that lived around that car lot that said they just absolutely wouldn't mind, then we as a city, as a governing body, do have the ability to allow a variance. That gives us flexibility within our laws which is a very good thing. You cannot have a law necessary to fit every single situation. And this may very well be a good opportunity to allow a variance in this case." (*Id.*, at 49:16–25). Mayor Manlove moved to defer a final vote to allow time to speak with the affected residents. The Council unanimously voted to defer the decision for two weeks.

At the August 15, 2006 continuation of the hearing, Chambers submitted letters from all the nearby residents stating that they did not oppose having a car dealership at 2801 Preston Road. (Docket Entry No. 59, Ex. U). Councilman Barker explained that he had driven past the lot and seen overgrown weeds. Barker stated, "I really believe that with a good car lot there and well maintained and taken care and meet all the requirements of the City that it would actually be an improvement of that particular spot. And since we have an okay from all the people who are surrounding there that we had a problem to begin with, then I can go along with that." (Docket Entry No. 59, Ex. F, Transcript of August 15, 2006 City Council meeting, at 6:4–10). Councilwoman Welch observed

15

that Chambers's other business in Pasadena was always "neat and clean" so she would "go with him today" and vote to approve his license because he "will do a good job over there." (*Id.*, at 6:17–19). Councilman Guthrie explained that because the nearest subdivision was unrestricted and allowed commercial lots, and because none of the residents objected to having a car lot at 2801 Preston Road, he would also vote in favor of granting the license. (*Id.*, at 7:9–16).

Some members expressed concern about the "message" the Council would send to the community by approving this license application. Mayor Manlove stated: "I agree that our planning department, they are charged with upholding the law as the ordinances are written. However, the way our city government is structured, you can appeal a ruling by the department and bring it before the council in which we have by the authority vested in the people of Pasadena to allow variances from time to time which we do, which allows some flexibility to the law. Because many times one law doesn't fit every single situation." (*Id.*, at 10:25–11:9). The City Council voted unanimously in favor of granting Chambers a used-car dealer license for 2801 Preston Road.

In their amended complaint, the Lindquists alleged that they were denied due process and equal protection because the City denied their appeal but granted licenses on appeal for two applicants whose lots did not comply with the ordinance distance requirements. The Lindquists alleged that "[t]he existence of unbridled discretion for the City to approve, or to deny licenses, violates the requirements of due process and/or the equal protection clauses of the 14th amendment of the United States Constitution, and of Article I, Sections 3&19 of the Texas Constitution." (Docket Entry No. 14). The Lindquists alleged that they were similarly situated to the Nielsens and to Chambers, and that the City had no rational basis to grant their appeals while denying the Lindquists' appeal. Finally, the Lindquists alleged that the City denied them substantive and procedural due process.

16

This court granted the City's Rule 12(b)(6) motion to dismiss for failure to state a claim. (Docket Entry No. 22). The Fifth Circuit affirmed the dismissal of all claims except the class-of-one equal protection claim. The Fifth Circuit stated that to prevail on this claim, "the Lindquists must carry the heavy burden of 'negativing any reasonably conceivable set of facts that could provide a rational basis' for their differential treatment." *Lindquist*, 525 F.3d at 387. After extensive discovery, the parties moved for summary judgment.

## II. The Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "'An issue is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)). "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)

(en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" *Little*, 37 F.3d at 1075 (internal citations omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 (citation omitted).

## III.   Analysis

### A.   The Unbridled Discretion Claim

The Lindquists argue that the Fifth Circuit's decision that the ordinance is facially valid did not foreclose an as-applied challenge based on the City's "exercise of unbridled discretion" in deciding whether to affirm or deny the decisions of City officials denying license applications. They contend that although the ordinance's written requirements are facially valid, the City has established an unconstitutional policy or custom by not following those requirements in deciding appeals from denials of license applications. The Lindquists contend that, contrary to the City's arguments, the "law of the case" doctrine and the mandate rule do not bar consideration of the merits of their unbridled discretion claim. The Lindquists assert that this court dismissed only their facial invalidity claim and that the Fifth Circuit expressly considered only the facial validity of the ordinance. The Lindquists argue that no court has considered the merits of their as-applied challenge.

18

The City responds that the Fifth Circuit affirmed the dismissal of all claims except the class-of-one equal protection claim.  The City notes the Fifth Circuit's holding that "[t]he district court did not err in dismissing the Lindquists' 'unbridled discretion' claim."  *Lindquist*, 525 F.3d at 388. According to the City, this holding is the law of the case, barring this court's consideration on remand of the unbridled discretion claim.  Finally, the City  argues that the mandate rule, which "compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court," *Furhman v. Dretke*, 442 F.3d 893, 897 (5th Cir. 2006), bars consideration of the unbridled discretion claim.[1]  The City also contends that, even if considered on the merits, the as-applied unbridled-discretion challenge fails because the Lindquists have failed to show a policy or custom to exercise such discretion, much less to an unconstitutional degree.  The City also argues that the Lindquists have misrepresented the nature of their claims.  According to the City, because the Fifth Circuit upheld the ordinance as facially valid, "the Plaintiffs could only complain that the provisions of the Ordinance were being selectively enforced against them, in the resolution of their appeal, for unconstitutional reasons – i.e., that, others who were similarly situated were treated differently with no conceivable rational basis – the very standard set forth in the Fifth Circuit's opinion."  (Docket Entry No. 65, at 5).  This means that the Lindquists must meet "the hurdles outlined for a 'class of one' equal protection claim" for their

---

[1]  The City also argues that, even if it is not barred by law of the case, the as-applied challenge is not properly before this court because the Lindquists did not plead this claim in their amended complaint. This argument is not persuasive.  In the amended complaint, the Lindquists alleged that "as applied, the City arbitrarily determines what City law actually prohibits: any person can obtain a license if City Council votes approval, in an appeal process with no standards, published or otherwise; some can obtain a license without following the stated rules and without any appeal; and other dealers can sell without even obtaining a license."  (Docket Entry No. 14).  The Lindquists did plead that the City exercised unbridled discretion in granting or denying appeals from license denials.

claims, however labeled.  (*Id.*).  The City contends that the Lindquists "cannot escape this burden through semantics or artful attempts at revival of dismissed claims."  (*Id.*).

"An issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal."  *United States v. Becerra*, 155 F.3d 740, 752 (5th Cir. 1998).  The law-of-the-case doctrine applies not only to matters decided explicitly but also to matters settled "by necessary implication."  These are "matters that were fully briefed to the appellate court and were necessary predicates to the ability to address the issue or issues specifically discussed are deemed to have been decided tacitly or implicitly, and their disposition is law of the case."  *Office of Thrift Supervision v. Felt*, 255 F.3d 220, 225 (5th Cir. 2001).  "[T]he law of the case controls legal claims which were fully litigated and decided in the first appeal, even if parties seek to introduce new legal or factual evidence on remand."  *Cooper Tire & Rubber Co. v. Farese*, 248 Fed. App'x 555, 558 (5th Cir. 2007).  Courts have discretion to reexamine a decision covered by the law-of-the-case doctrine under narrow exceptions: "if substantially different evidence has been presented, there has been an intervening change in the law, or the prior decision was clearly erroneous and it would work a manifest injustice."  *Browning v. Navarro*, 887 F.2d 553, 556 (5th Cir. 1989).

"The mandate rule requires a district court on remand to effect [the appellate court's] mandate and to do nothing else."  *United States v. Castillo*, 179 F.3d 321, 329 (5th Cir. 1999) (citing *Becerra*, 155 F.3d at 753).  On remand, the district court "must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court."  *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (quoting *Becerra*, 155 F.3d at 753).  "In implementing the mandate, the district court must 'take into account the appellate court's opinion and the circumstances it embraces.'"  *United States v. Lee*, 358 F.3d 315, 321 (5th Cir.

2004) (quoting *Sobley v. Southern Natural Gas Co.*, 302 F.3d 325, 333 (5th Cir. 2002)).  Because

the mandate rule is a corollary of the law of the case doctrine, it "compels compliance on remand

with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly

decided by the appellate court."  *Castillo*, 179 F.3d at 329 (citation omitted).

In their amended complaint, the Lindquists challenged "the [City Council's] appeal without

rules and the policy and practice allowing only some dealerships to avoid the 1000' rule, the 150'

rule, and the requirements to obtain a license."  (Docket Entry No. 14).  The Lindquists alleged that

"as-applied, the City arbitrarily determines what City law actually prohibits: any person can obtain

a license if City Council votes approval, in an appeal process with no standards, published or

otherwise."  (*Id.*).  This court granted the City's motion to dismiss for failure to state a claim,

rejecting the Lindquists' argument that the ordinance is unlawful because it gives unfettered

discretion to the City Council.  On appeal, the Fifth Circuit first considered the Lindquists' equal

protection and due process claims.  The appellate court reversed the dismissal of the class-of-one

equal protection claim but affirmed dismissal of the due process claims.  Finally, the appellate court

analyzed the "unbridled discretion" claim, stating as follows:

> [T]he district court did not err in dismissing the Lindquists'
> "unbridled discretion" claim.  Though framed as a distinct claim,
> their allegation that "[t]he existence of unbridled discretion for the
> City to approve[ ] or deny licenses," violated their due process and
> equal protection rights overlaps with the claims analyzed above.  To
> the extent the Lindquists argue that the licensing ordinance is facially
> invalid because it does not provide adequate standards to guide the
> city's discretion, they are incorrect for the reasons stated in the
> district court's opinion: (1) unlike the ordinances at issue in *Spann v.
> City of Dallas*, 111 Tex. 350, 235 S.W. 513 (Tex. 1921), and other
> authorities the Lindquists cite, the ordinance at issue here sets forth
> detailed requirements that city officials are to apply in deciding
> whether an applicant is entitled to a license; and (2) the ordinance
> requires an applicant to prove on appeal to the city council that he
> satisfies the ordinance's requirements to obtain a license.  The district

21

> court's holding that the ordinance is not facially invalid was thus
> correct.

*Lindquist*, 525 F.3d at 388.  The Fifth Circuit expressly affirmed this court's holding that the ordinance is facially valid.  But neither this court nor the Fifth Circuit considered the merits of the Lindquists' as-applied challenge to the ordinance.  Nor was the as-applied challenge "fully briefed to the appellate court" or a "necessary predicate[] to the [Fifth Circuit's] ability to address the" facial validity of the ordinance.  If the as-applied "unbridled discretion" claim is a distinct claim from the equal protection class-of-one claim, this court is not barred from considering it on the merits.

The Lindquists' as-applied unbridled discretion claim, however, is not a distinct claim from the class-of-one equal protection claim remanded to this court.  The Lindquists have not articulated how their as-applied unbridled discretion claim differs from the equal protection claim.  The as-applied challenge is based on the Lindquists' argument that the City "established a clear policy and custom of unbridled discretion when granting or denying licenses"; "the City in fact exercised this unbridled discretion in each appeal to city council"; and the City cannot "identify any basis to distinguish the Lindquist appeal – which was denied – from two other appeals, which were granted." (Docket Entry No. 55, at 3).  In the class-of-one equal protection claim, the Lindquists argue that the City's "policy and custom that authorizes City Council to exercise unbridled discretion in deciding whether the Lindquists, Nielsens, and Chambers/Henderson could obtain used car dealer licenses" shows that there is no rational basis for the difference in treatment.  (Docket Entry No. 67, at 14).  The Lindquists argue that "there is no legitimate state interest" for the exercise of "unbridled discretion to grant or deny a license when an applicant does *not* comply with the Ordinance."  (*Id.*) (emphasis in original).  The Lindquists' as-applied unbridled discretion claim and their class-of-one equal protection claim are based on the same facts, arguments, and authorities.  The Fifth Circuit

recognized that the claims overlapped. *See Lindquist*, 525 F.3d at 388 ("Though framed as a distinct claim, their allegation that 'the existence of unbridled discretion for the City to approve or deny licenses,' violated their due process and equal protection rights overlaps with the claims analyzed above, [including the class-of-one claim]."). For the City to be held liable under 42 U.S.C. § 1983 for the unbridled discretion claim, the City's alleged policy or custom of exercising unbridled discretion must cause a constitutional violation. The Lindquists have not alleged a constitutional violation other than equal protection and due process. The Fifth Circuit affirmed the dismissal of all the Lindquists' constitutional claims except the class-of-one equal protection claim. The as-applied unbridled discretion claim is not separate from the equal protection analysis. As such, to show that the ordinance was unconstitutionally applied to them, in violation of equal protection, "the Lindquists must carry the heavy burden of 'negativing any reasonably conceivable state of facts that could provide a rational basis' for their differential treatment." *Id.* at 387. The merits of the as-applied unbridled discretion claim are analyzed in connection with the merits of the equal protection claim.

### B.   The Class-of-One Equal Protection Claim

#### 1.   The Requirements for a Class-of-One Claim

In *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000), the Supreme Court recognized that an equal protection claim can be brought by a "'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564. The plaintiffs in *Olech* alleged that the Village had conditioned the connection of their property to the municipal water supply on the grant of an easement larger than the Village required of other property owners. *Id.* at 563. The plaintiffs alleged that the Village's request was motivated by ill

23

will resulting from an earlier lawsuit they had filed against the Village.  *Id.*  The district court dismissed the complaint for failure to state a claim.  The Seventh Circuit reversed, finding that the plaintiffs had alleged a class-of-one equal protection claim.  *Olech v. Village of Willowbrook*, 160 F.3d 386 (7th Cir. 1998), *cert. granted in part*, 527 U.S. 1067, 120 S. Ct. 10, 144 L. Ed. 2d 841 (1999) *and judgment aff'd*, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000).  The Seventh Circuit recognized and was troubled by the "prospect of turning every squabble over municipal services . . . into a federal constitutional case."  *Olech*, 160 F.3d at 388.  But the court concluded that this problem was alleviated by the requirement under Seventh Circuit case law that the plaintiff allege and prove subjective "ill will" or "illegitimate animus" in a class-of-one equal protection case. *Id.*      The Supreme Court affirmed in a brief *per curiam* opinion.  The Court stated: "Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Olech*, 528 U.S. at 564.  The Court concluded that the plaintiff's allegations — that the Village demanded a larger easement than it demanded from other similarly situated property owners, and that the demand was "irrational and wholly arbitrary" were, "quite apart from the Village's subjective motivation . . . sufficient to state a claim for relief under traditional equal protection analysis."  *Id.* at 565.  The Supreme Court affirmed the Seventh Circuit's opinion but did not "reach the alternative theory of 'subjective ill will' relied on by that court."  *Id.*

Justice Breyer wrote a concurring opinion to express his view that a run-of-the-mill zoning decision would not violate the Equal Protection Clause because an additional factor had to be present: an allegation of "vindictive action," "illegitimate animus," or "ill will."  *Id.*  That additional factor was necessary to prevent all zoning decisions from turning into alleged equal protection

violations.  *Id.*  The added element avoided putting the federal courts in the position of a super-zoning board, reviewing routine decisions of municipal governance raised under a class-of-one equal protection challenge.

Since the *Olech* decision, courts have struggled to define what a plaintiff must prove to succeed on a class-of-one equal protection claim.[2]  "All have recognized that, unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors."  *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210–11 (10th Cir. 2004).  "Some courts, taking the lead of Justice Breyer, have attempted to cabin the reach of class-of-one equal protection cases by demanding that plaintiffs present evidence not merely of arbitrariness but of malice or ill-will against the plaintiff."  *Id.* at 1211 (citing *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 283 (7th Cir. 2003) (adopting Justice Breyer's concurrence as the holding of *Olech* and noting that the malice requirement "is a very significant burden" put in place to ensure that federal courts do not become "zoning boards of appeal"); *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499-500 (2d Cir. 2001) (personal animus is an element of a class-of-one case); *Williams v. Pryor*, 240 F.3d 944, 951 (11th Cir. 2001) (explaining *Olech* as "holding that plaintiff stated constitutional Equal Protection Clause cause of action by alleging that village acted irrationally, wholly arbitrarily, and out of malice toward plaintiff")).  The courts have emphasized the need to proceed cautiously in applying the class-of-one theory.  One court has helpfully summarized the concern expressed in these cases:

---

[2]  "The [*Olech*] decision was a mere five paragraphs long, and seemingly very straightforward, but it has prompted varied reactions and considerable disagreement in the lower courts."  Michael S. Giaimo, *Challenging Improper Land Use Decision-Making Under the Equal Protection Clause,* 15 FORDHAM L. REV. 335 (2004).

In the paradigmatic class-of-one case, a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive. *See Lauth v. McCollum,* 424 F.3d 631, 633 (7th Cir. 2005) (citations omitted):

> The paradigmatic "class of one" case, more sensibly conceived, is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen. Perhaps he is the holder of a license from the state to operate a bar or restaurant or other business, and the official deprives him of a valuable property right that identically situated citizens toward whom the official bears no ill will are permitted the unfettered enjoyment of. As one moves away from the paradigmatic case, the sense of a wrong of constitutional dignity, and of a need for a federal remedy, attenuates.

Most circuits . . . have proceeded cautiously in applying the theory, sensitive to Justice Breyer's warning against turning even quotidian exercises of government discretion into constitutional causes. *See, e.g., Jennings v. City of Stillwater,* 383 F.3d 1199, 1210-11 (10th Cir. 2004). An approach that reads *Olech* too broadly could transform the federal courts into "general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system." *Id.* at 1211. Such a pervasive threat of federal litigation could straightjacket local governments that have neither the capacity to document the reasoning behind every decision nor the means to withstand an onslaught of lawsuits.

*Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1209 (10th Cir. 2006) (McConnell, J.). In another opinion, the same judge analyzed the circuit variations on the requirements of a class-of-one claim:

> One circuit appeared to reject a requirement of subjective ill will, *see Jackson v. Burke*, 256 F.3d 93, 97 (2d Cir. 2001) (per curiam) ("To be sure, proof of subjective ill will is not an essential element of a 'class of one' equal protection claim."), but has since called its early statements "merely dicta" and determined that the question remains

26

open, *Bizzarro v. Miranda*, 394 F.3d 82, 88 (2d Cir. 2005).  Another
has explicitly construed *Olech* as requiring subjective animus, *see
Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000)
("gloss[ing]" *Olech* as requiring animus), although subsequent panels
have attempted to change course, *see Racine Charter One, Inc. v.
Racine Unified Sch. District*, 424 F.3d 677, 683–84 (7th Cir. 2005)
(noting competing lines of cases within the circuit and reserving the
question).  Two courts of appeals have adopted an approach similar
to that of the majority, recognizing two or three types of class-of-one
claims, only one of which requires subjective ill will.  *See Mikeska
v. City of Galveston*, 451 F.3d 376, 381 & n.4 (5th Cir. 2006);
*TriHealth, Inc. v. Bd. of Comm'rs, Hamilton County*, 430 F.3d 783,
788 (6th Cir. 2005).  *But see Shipp v. McMahon*, 234 F.3d 907, 916
(5th Cir. 2000) (holding that *Olech* requires "illegitimate animus or
ill will"), *overruled in part on other grounds, McClendon v. City of
Columbia*, 305 F.3d 314 (5th Cir. 2002) (en banc).

*Christian Heritage Acad. v. Okla. Secondary Sch. Activities Assoc.*, 483 F.3d 1025, 1043 n.3 (10th

Cir. 2007) (McConnell, J., concurring in part and dissenting in part); *see also Schor v. City Of

Chicago*, --- F.3d ----, 2009 WL 2461392 (7th Cir. Aug. 13, 2009) ("To allege a 'class of one' claim,

the plaintiffs need to show (1) that they were intentionally treated differently from others similarly

situated, and (2) that there was no rational basis for that differential treatment, *or* that the differential

treatment was the result of an illegitimate animus toward the plaintiffs by the defendants.")

(emphasis added).  As one commentator has noted, the case law on the contours of the class-of-one

claim remains "muddled" and "in disarray."  Giaimo, 15 FORDHAM L. REV. at 344–45.  The "lack

of resolve and clarity has perpetuated confusion in the district courts."  *Id.* at 345.

The Supreme Court has recently further narrowed *Olech*.  In *Engquist v. Oregon Dep't of

Agriculture*, 128 S.Ct. 2146 (2008), the Court held that the class-of-one theory does not apply to

decisions made by government in its role as employer.  The Court stated the rationale of its holding

broadly:  the "class of one" theory does not apply to government decisionmaking that is necessarily

"subjective and individualized, resting on a wide array of factors that are difficult to articulate and

quantify." *Id.* at 2154.  The lower courts have read and applied *Engquist* as meaning the class-of-one

theory is  also unavailable in other contexts besides government employment, if government

officials must make subjective discretionary decisions.[3]

The Fifth Circuit's position on the requirements for proving a class-of-one equal protection

claim has also evolved since *Olech*.  In *Bryan v. City of Madison, Miss.*, 213 F.3d 267 (5th Cir.

2000), the Fifth Circuit's first post-*Olech* equal protection decision, the plaintiff was denied a permit

to build apartments on land he had contracted to buy but had not yet closed.  The plaintiff alleged

that the defendants prevented him from obtaining the permit until after the contract expired.  The

plaintiff alleged that: (1) the defendants applied zoning standards unreasonably by vetoing his

applications; and (2) the "extraordinary" process he faced violated his equal protection rights.  *Id.*

at 276.  The Fifth Circuit held that the first claim fell within the standard equal protection analysis,

which requires proof that similarly situated individuals were treated differently, and that the plaintiff

had failed to even allege those elements.  *Id.*   The plaintiff's second claim was selective

_____

[3]  *See, e.g.*, *Crippen v. Town of Hempstead,* 2009 WL 803117, *4 (E.D.N.Y. Mar. 25, 2009) (stating that "[i]n
addition to the two elements set forth [in *Willowbrook v. Olech,* 528 U.S. 562 (2000)], the Supreme Court
recently set forth another requirement for plaintiffs bringing class of one claims.  [S]pecifically . . . such
plaintiffs must show that the differential treatment received resulted from *non-discretionary* state action."); 
*Seymour's Boatyard, Inc. v. Town of Huntington*, 2009 WL 1514610 (E.D.N.Y. June 1, 2009) (extending
*Engquist* to bar use of the class-of-one theory to challenge a town's revocation of license to operate a moor
and launch from a town beach); *Tarantino v. City of Hornell,* 615 F.Supp.2d 102, 117 & n. 11 (W.D.N.Y.
May 28, 2009)(extending *Engquist* to bar a class-of-one challenge to town code provisions governing rental
property, due to the degree of discretion involved); *Upthegrove v. Holm,* 2009 WL 1296969, *1 (W.D. Wis.
May 7, 2009)(holding that *Engquist's* rationale precludes applying the class-of-one theory in the context of
a prison employee's decision about what an inmate could wear at a particular time); *Bissessur v. Indiana
Univ. Bd. of Trustees,* 2008 WL 4274451, *9 (S.D. Ind. Sept. 10, 2008) (extending *Engquist* to bar using the
class-of-one theory to challenge a school's decision to expel a student); *Siao-Pao v. Connolly,* 564 F.Supp.2d
232, 245 (S.D.N.Y. 2008) (extending *Engquist* to bar class-of-one challenge to a parole board's decision to
deny parole, because of the necessarily subjective and individualized nature of such decisions); *Harmon v.
St. Louis Cty.,* 2009 WL 880024 (E.D. Mo. Mar. 30, 2009) (dismissing claim that county violated equal
protection by treating the plaintiff worse than others who had been in automobile accidents with a county
police officer, stating broadly, "a 'class of one' theory of equal protection is inapplicable in a context that
involves discretionary decisionmaking.").

enforcement.  *Id.* at 277.  The Fifth Circuit cited pre-*Olech* cases on selective-enforcement claims that required allegations and proof of subjective animus or ill will.  The court read *Olech* to stand for the proposition that single plaintiffs can bring an equal protection claim based on selective enforcement but must allege an improper motive to state such a claim.  *Id.* at 277 n.17.  The court concluded that the plaintiff had failed to allege an improper motive and affirmed the lower court's dismissal under Rule 12(b)(6).  *Id.* at 277.

The court in *Shipp v. McMahon*, 234 F.3d 907, 916 n.6 (5th Cir. 2000), *overruled on other grounds by McClendon v. City of Columbia*, 305 F.3d 314, 328–29 (5th Cir. 2002) (per curiam), noted that a class-of-one equal protection claim was a novel issue for the Fifth Circuit.  "This court has yet to confront an Equal Protection challenge in the context of a class of one claim."  *Id.* (quoting *Bryan*, 213 F.3d at 277 n.18 (stating that "'[w]e have never specifically addressed whether [a motive of subjective animus] would be enough to support an equal protection claim without some other class-based discrimination, but that issue is not before us.'"))  In *Shipp*, a woman sued a county sheriff and deputy sheriffs, alleging equal protection violations based on law enforcement's failure to protect her from a brutal attack by her husband.  The police knew of the husband's propensity for violent behavior and that he had threatened his wife.  One of the defendants was the dispatcher who took the phone call reporting that the husband had tracked the plaintiff down and dragged her away.  The dispatcher was the husband's mother.  She hung up the telephone without inquiring into the particulars of the incident and took no action other than advising one other deputy.  By the time law enforcement found the couple, the plaintiff had been raped and shot.  The Fifth Circuit stated that "[t]o state a claim sufficient for relief, a single [class-of-one] plaintiff must allege that an illegitimate animus or ill will motivated her intentionally different treatment from others similarly situated and that no rational basis existed for such treatment."  *Shipp*, 234 F.3d at 916

29

(citing *Olech*, 120 S. Ct. at 1074–75).  The court found that while an individual has no constitutional right to police protection, a municipality may not discriminate in providing such protection.  *Id.* (citation omitted).  The court noted that in class-of-one equal protection cases alleging unequal police protection, the plaintiff must "'present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for *reasons of a personal nature unrelated to the duties of the defendant's position*.'"  *Id.* (quoting *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000)) (emphasis added).  The Seventh Circuit in *Hilton* had "reasoned that such an improper motive is critical and . . . its absence will defeat an Equal Protection challenge to unequal police protection."  *Id.* (citing *Hilton*, 209 F.3d at 1008).  The *Shipp* court concluded that if the plaintiff's mother-in-law maintained ill will against her, the plaintiff might be able to establish an unequal police-protection claim under *Olech*.  *Id.* at 916–17.

In 2003, in a case similar to *Bryan*, the Fifth Circuit held that a plaintiff alleging a class-of-one equal protection claim had to plead and prove that ill will or other illegitimate animus motivated the decision to treat the plaintiff differently.  In *Beeler v. Rounsavall*, 328 F.3d 813 (5th Cir. 2003), a store owner sued the city and its officials for violating his equal protection rights in handling his application for a liquor permit under the city's ordinances.  The court concluded that the plaintiff's first claim—that the defendants applied the ordinances unreasonably to his permit application—was a standard equal protection claim that required allegations and proof that the plaintiff was treated differently from others similarly situated.  328 F.3d at 816–17.  The second claim—that the extraordinary process the plaintiff faced, including extensive delays, violated his equal protection rights—was akin to a selective-enforcement claim.  *Id.* at 817.  On the second claim, the court held that the plaintiff's case failed because he had not alleged or provided any evidence of any motive, let alone an improper one, for the city's actions.  *Id.*  The court stated: "The 'text of the Equal

30

Protection Clause, the history leading to its adoption, [and] a century of jurisprudence that has in the main interpreted the clause to prohibit only disparate treatment based upon group or class factors' suggests that personal vindictiveness by itself is insufficient as an improper motive in the absence of some other class- or group-based discrimination." *Id.* at 818 (quoting Timothy Zick, *Angry White Males: The Equal Protection Clause and "Classes of One,"* 89 KY. L.J. 69, 75 (2000/2001)). The court did not decide this issue because the plaintiff had not provided any evidence of personal vindictiveness. *Id.*

In 2006, the Fifth Circuit drew a distinction between selective-enforcement class-of-one equal protection cases and adverse-zoning-decision class-of-one cases in *Mikeska v. City of Galveston*, 451 F.3d 376 (5th Cir. 2006). A hurricane had changed the beach line, leaving the plaintiffs' homes on the beach and in violation of the Texas Open Beaches Act. The City cut off the plaintiffs' utilities because the homes violated the Act and refused to grant the plaintiffs permits to reconnect the utilities. *Id.* at 378–79. The plaintiffs alleged an equal protection violation because other homes that violated the Act had been allowed to reconnect. *Id.* at 381. The Fifth Circuit held that a class-of-one claim arising from a denial of a zoning permit requires a showing of different treatment for those similarly situated without a rational basis. *Id.* The court noted that this claim was not one of two other types of class-of-one claims—"selective enforcement" or "personal vindictiveness"—and did not require the higher evidentiary burden applied to those claims. *Id.* at 381 n.4 (citing *Allred's Produce v. United States Dep't of Agric.*, 178 F.3d 743, 748 (5th Cir. 1999) ("selective enforcement"); *Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995) ("personal vindictiveness"); *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000) ("personal vindictiveness")). The court reversed the grant of summary judgment against the plaintiffs. *Id.* at 382.

31

In this circuit, "not "all 'class of one' equal protection claims require a showing of vindictive animus." *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 824 n.3 (5th Cir. 2007). The circuit recognizes three different types of class-of-one claims: (1) "selective enforcement"; (2) adverse zoning permit decisions; and (3) "personal vindictiveness." *See Mikeska*, 451 F.3d at 381 n.4.[4] Cases involving a claim based on selective enforcement generally require a showing of ill will or illegitimate animus. *See*, *e.g.*, *Shipp*, 234 F.3d at 916; *Beeler*, 328 F.3d at 817; *Bryan*, 213 F.3d at 277. In contrast, a claim arising from an adverse zoning decision requires a showing of intentionally different treatment from others similarly situated without a rational basis for the distinction. *See Mikeska*, 451 F.3d at 381 ("To bring such an equal protection claim for the denial of zoning permits, the appellant must show that the difference in treatment with others similarly situated was irrational.") (citing *Olech*, 528 U.S. at 564).[5] *Bryan* and *Beeler* demonstrate the distinction between

---

[4] As stated, the rule distinguishing between selective enforcement and adverse zoning permit decisions seems clear — two different types of class-of-one claims with two different tests. But while selective enforcement cases will not always involve zoning decisions, cases challenging the denial of a zoning permit will often involve selective enforcement of zoning laws. If an applicant violates the zoning permit requirements and is denied a permit, but the municipality grants a permit to other applicants who also violate those requirements, the municipality is selectively enforcing the zoning laws. If a permit applicant meets the zoning requirements and is denied the permit, while others who also meet the requirements are granted permits, that is not selective enforcement. The Fifth Circuit's decision in *Mikeska* did not delineate the boundaries between the denial of a zoning permit to an applicant who did not meet the law's requirements for a permit and selective enforcement of the law. The defendants in *Mikeska* allegedly allowed some parties who did not comply with the law to have their utilities reconnected, while at the same time denying the plaintiff–who also did not comply–reconnection. Similarly, in the present case, the Lindquists alleged that although their lot did not comply with the ordinance distance requirements for a license, the City selectively enforced the ordinance by denying their appeal from the license denial while granting the appeals of two other applicants whose lots did not comply. The *Mikeska* court apparently carved out zoning claims from other selective-enforcement cases in holding that personal animus or ill will did not have to be alleged. The *Mikeska* test applies to the Lindquists' claim.

[5] *Mikeska* quoted *Olech's* statement that Supreme Court cases "have recognized successful equal protection claims where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." The decision in *Mikeska*, however, does not mention the requirement that a plaintiff prove he was "intentionally treated differently." *See Mikeska*, 451 F.3d at 381 ("To bring such an equal protection claim for the denial of zoning permits, the appellant must show that the difference in treatment with others similarly situated was irrational."). To the

claims arising from zoning decisions and claims involving selective enforcement.  In those cases, claims that were characterized as challenges to zoning decisions required the plaintiff to show different treatment and the absence of a rational basis.  *See Beeler*, 328 F.3d at 816–17; *Bryan*, 213 F.3d at 276.  Claims that were characterized as challenges to the selective enforcement of ordinances – including zoning ordinances – required the plaintiff to show improper motive.  *See Beeler*, 318 F.3d at 817; *Bryan*, 213 F.3d at 277, 277 n.17.

In the present case, the Fifth Circuit held that the Lindquists' equal protection claim did not sound in selective enforcement but rather was controlled by *Mikeska*.  Accordingly, the Lindquists' class-of-one equal protection claim has two elements.  The Lindquists must show that: 1) they were intentionally treated differently from others similarly situated; and 2) there was no rational basis for the disparate treatment.  *See Olech*, 528 U.S. at 564; *Unruh v. Moore*, 2009 WL 1310981, at *1–2 (5th Cir. May 12, 2009); *Whiting v. Univ. of Southern Miss.*, 451 F.3d 339, 348 (5th Cir. 2006).  As the Fifth Circuit stated, the Lindquists "must carry the heavy burden of 'negativing any reasonably conceivable state of facts that could provide a rational basis' for their differential treatment." *Lindquist*, 525 F.3d at 387.

---

extent *Mikeska* can be read as requiring merely arbitrary or irrational treatment of similarly situated individuals, without evidence of intentional discrimination, it is inconsistent with equal protection jurisprudence.  *See Washington v. Davis*, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (requiring proof of discriminatory intent in equal protection cases); *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944) ("The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination."); *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001) (to prove an equal protection violation, plaintiffs must establish that they "received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent"); *E & T Realty v. Strickland*, 830 F.2d 1107, 1114 (11th Cir. 1987) ("Even arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause.").

### 2.      Similarly Situated

The Lindquists argue that they are similarly situated to the Nielsens and to Chambers because "all three were denied licenses by City staff for noncompliance with distancing requirements under the Code, and all three timely appealed."  (Docket Entry No. 67, at 13).  They assert that City Council members "recognized that the Lindquists were similarly situated to the Nielsens, located close-by on the same street" and that "in each case, they were being asked to make a decision to grant a license contrary to the requirements stated in the Ordinance."  (*Id.*, at 11).

The City argues that the undisputed facts in the record show that the Lindquists were not similarly situated to the Nielsens and to Joe Chambers in material respects.  The City points to differences among the three lots and to differences in the appeals to the City Council after the licenses were denied.  The City argues that the Nielsen and Chambers lots were both previously used as car dealerships, while the Lindquist lot was previously used a gas station.  The prior owner of the Nielsen lot at 4545 Spencer Highway had spent considerable sums before the ordinance was amended to improve the property specifically for the purpose of a car dealership.  The City argues that these improvements made the Nielsen lot "uniquely suitable for a car dealership."  (Docket Entry No. 59, at 12).  The Chambers lot at 2801 Preston Road also had been improved for use as a car dealership before the ordinance was amended.  The Lindquists' lot, which was never operated as a car dealership, had no such improvements.

It is undisputed that the Lindquist lot violated the 1,000-foot rule and the Lindquists made no argument that their lot was exempt from the rule under the grandfather clause in the ordinance.  On appeal to the City Council, the Nielsens did argue that the grandfather clause applied to exempt their lot from the 1,000-foot rule.  The 1,000-foot rule was never presented to the City Council as a basis for denying the Chambers appeal.  The  Chambers lot license denial was based on the 150-

34

foot rule.  Chambers obtained the consent of every nearby resident to once again have a car dealership at 2801 Preston Road.  The Lindquist license denial was not based on the 150-foot rule.

Chambers presented information to City Council that before he bought the lot at issue, he had received assurances from City officials that the lot was in compliance with the ordinance and he would be eligible for a used-car dealer license.  In contrast, the Lindquists were expressly told by City officials before they purchased their lot that the property at 4646 Spencer Highway did not qualify for a used-car dealer license under the ordinance.

"[A] court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met."  *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004); *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (same).  "The burden that a class of one plaintiff must carry at the summary judgment stage is considerably heavier than a mere showing that others have applied, with more auspicious results, for the same benefit that he seeks."  *Cordi-Allen v. Conlon*, 494 F.3d 245, 252 (1st Cir. 2007).  To meet this burden, the evidence must support an inference of a high degree of similarity between the plaintiff and the comparators in the areas relevant to the government's purpose or mission.  *See Clubside*, *Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (recognizing that the similarly situated showing in a class-of-one case is "more stringent than that used at the summary judgment stage in the employment discrimination context"); *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *overruled in part on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (stating that "the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high"); *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) (requiring a class-of-one plaintiff to show it is "prima facie identical [to the proposed comparator] in all relevant respects").  Because the Supreme Court considered *Olech* on

a motion to dismiss, it had nothing more than an allegation that the plaintiff was similarly situated

to others.  Since then, as *Olech* claims are examined at the summary judgment stage, when the

factual record is more thoroughly developed, courts have insisted that plaintiffs demonstrate

similarity in all material respects.  *See Neilson,* 409 F.3d at 105 (requiring a class-of-one plaintiff

to show that "no rational person could regard the circumstances of the plaintiff to differ from those

of a comparator to a degree that would justify the differential treatment on the basis of a legitimate

government policy"); *Jennings*, 383 F.3d at 1214 (holding that it is "imperative for the class-of-one

plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the

favored class"); *McDonald,* 371 F.3d at 1002 (requiring that the other parties be "very similar

indeed").

Courts have repeatedly rejected arguments similar to those made by the Lindquists that the

similarities of alleged comparators need not be subjected to detailed review.[6]  "The 'similarly

---

[6]  *See*, *e.g.*, *Taylor Acquisitions*, *L.L. C. v. City of Taylor*, 313 Fed. Appx. 826, 836 (6th Cir. 2009) ("[B]are allegations that 'other' applicants, even 'all other' applicants, were treated differently" is insufficient; a plaintiff must show that "these 'other' applicants were similarly situated to the plaintiff."); *Jicarilla*, 440 F.3d at 1213 (rejecting class-of-one claim brought by a plaintiff challenging a land reclassification that affected property taxes and observing that "courts have imposed exacting burdens on plaintiffs to demonstrate similarity in class-of-one cases"); *Beeler*, 328 F.3d at 817 (rejecting an argument made by a plaintiff who unsuccessfully applied for a new liquor store permit that he was similarly situated to a store owner who had received a renewal permit because "the two stores were located in adjacent buildings and sold the same basic items"; the court held that "the relevant criterion here is not the two stores' proximity or the similarity of their products" but "whether the two stores were similarly situated under the [Alcohol and Beverage] Code," which distinguished between new applications and the renewal of existing permits); *Occhionero v. City of Fresno*, 2008 WL 2690431, at *10 (E.D. Cal. July 3, 2008) (rejecting the plaintiff's attempt to "cast a broad net to establish similarity"); *Franklin v. City of Merriam*, 2008 WL 1884189, at *5 (D. Kan. Apr. 25, 2008) (rejecting a plaintiff car dealer's claim that he was "similarly situated with Country Hill Motors because they both sought to use the same property in the same manner (i.e., as a car dealership)"); *Highland Development*, *Inc. v. Duchesne Cty.*, 505 F.Supp.2d 1129, 1151–52 (D. Utah 2007) (rejecting a plaintiff home builder's argument that it should be compared to "other builders of single family homes" in the county because "[t]he scale of [plaintiff's] project alone is sufficient to distinguish the Plaintiffs from the three individual home builders"); *Sampson v. Town Of Salisbury*, 441 F.Supp.2d 271, 280 (D. Mass. 2006) ("Courts should not interpret the similarly situated standard broadly."); *Lakeside Builders*, *Inc. v. Planning Bd. of Franklin*, 2002 WL 31655250, at *3 (D. Mass. Mar. 21, 2002) (rejecting the argument that "all applicants should be considered 'similarly situated' . . . because they had all made requests for waivers of the dead-end street

situated' requirement must be enforced with particular rigor in the land-use context because zoning decisions 'will often, perhaps almost always, treat one landowner differently from another.'" *Cordi-Allen*, 494 F.3d at 251–52 (quoting *Olech*, 528 U.S. at 565 (Breyer, J., concurring)).  Such a high showing of similarity is justified because "unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors." *Jennings*, 383 F.3d at 1210; *see also Leib v. Hillsborough Cty. Public Transp. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009) (noting that the "'similarly situated' requirement must be rigorously applied in the context of 'class of one' claims" because "[e]mploying too broad a definition . . . could subject nearly all state regulatory decisions to constitutional review in federal court") (internal quotation and citation omitted).

A class-of-one plaintiff must establish "factual as well as regulatory similarity." *Cordi-Allen*, 494 F.3d at 252; *see also Beeler*, 328 F.3d at 817 (alleged comparators must be similarly situated "under the Code").  The cases involving land-use permits and regulation show that an alleged comparator's lot must be similar in size, scope, and use.  If a comparator receives a permit or license and the plaintiff does not, the applications and documentation must be extremely similar.  For example, in *Unique Properties, LLC v. Terrebonne Parish Consolidated Government*, 2004 WL 1278001 (E.D. La. 2004), *aff'd*, 150 Fed. App'x 313 (5th Cir. 2005), the court rejected an equal protection claim by a land developer arising out of the denial of a drainage variance.  The plaintiffs purchased property and filed an application to subdivide the tract into 29 lots.  The plaintiffs did not include drainage plans in the application and sought a variance from the drainage requirements.

---

length regulation," and noting that such a broad definition is not useful for equal protection analysis in that it "could be applied to any group of applicants where, looking back, one could see that there had been some who succeeded and some who failed").

Public hearings were held, and neighbors voiced concerns about flooding because of the property's low elevation and history of flooding during heavy rainstorms. The variance was denied. The plaintiffs filed an equal protection challenge, pointing to an adjacent tract for which the drainage variance was granted as evidence of arbitrary differential treatment. The court granted summary judgment in favor of the defendants because the plaintiffs "failed in their effort to demonstrate that they were 'similarly situated' in all relevant aspects to the other applicants." *Id.* at *5. The adjacent tract for which the town granted the drainage variance was higher in elevation, substantially smaller, and the comparator sought to divide the tract into only five lots, not twenty-nine. The court held that the plaintiffs' claim failed because the adjacent property was "not substantially similar with respect to elevation and number of lots." *Id.*

Similarly, in *Highland Development*, *Inc. v. Duchesne Cty.*, 505 F.Supp.2d 1129, 1151–52 (D. Utah 2007), the court found that the plaintiffs, real estate developers, failed to establish that they were similarly situated to a comparator. The plaintiffs were building a large residential development that required building permits and approvals from the county. They alleged that the county "maliciously delayed construction of [the project] by imposing irrational and burdensome design, building, and documentation requirements throughout the permit process." *Id.* at 1132. To satisfy their class-of-one equal protection burden, the plaintiffs pointed to other builders of single family homes in the county who had received the necessary permits. *Id.* at 1151. The court rejected this argument, holding that it defined the "favored class" too "narrowly." *Id.* The plaintiff's project was the largest active subdivision project in the county and "was slated to use railcar loads of unstamped and ungraded lumber in the construction of multiple single family homes for sale to third parties." *Id.* at 1152. The court held that the "scale of the Project alone" was enough to distinguish the plaintiffs from other home builders in the area. *Id.* Other large developers in the county were not

similarly situated because there was no evidence that any other large home builders planned to use unstamped and ungraded lumber in their construction.  *Id.*  The court held that the differences between the plaintiffs and the other developers provided an objectively reasonable basis for the county's different application of the building codes.  *Id.* at 1153; *see also Clubside*, *Inc. v. Valentin*, 468 F.3d 144, 159–60 (2d Cir. 2006) (finding that two proposed development projects were not similarly situated for purposes of an equal protection class-of-one claim because the projects involved different types of housing and density levels and the comparator project was of a much smaller scale); *Pansy Road*, *LLC v. Town Plan & Zoning Comm'n of the Town of Fairfield*, 2007 WL 2889456, at *2 (D. Conn. Sept. 29, 2007) (in a challenge to the denial of a building permit for the plaintiff's proposed residential subdivision, which would intersect with a road near the entrance to an elementary school and caused traffic safety concerns, the court held that the plaintiff's land was not similarly situated to two other nearby existing subdivisions; in one case, school traffic exited onto a different road than the subdivision, while in the other case, subdivision traffic did not exit onto the road where the school's main entrance and exit were located).

Courts have concluded that land-use projects for which a permit or license is required are materially different when one involves the expansion of an existing use and the other involves the construction of a new facility.  In *Cordi-Allen*, the plaintiffs owned a waterfront lot in a small Cape Cod town.  494 F.3d at 248.  When they bought the lot, which was "undersized," the only improvements on it were a small cottage and a short pier.  The plaintiffs sought to build a new large residence with an attached garage, expand the existing cottage, install a large swimming pool, and install floats to extend their existing pier, but were unable to do so because of "a series of zoning, environmental, and licensing restrictions."  *Id.*  They brought a class-of-one equal protection claim, alleging that the town had singled them out and thwarted their development plans.  The court

rejected the plaintiffs' argument that they were similarly situated to their neighbors, who were all subject to the same zoning rules but did not have the same difficulty in developing their lots, because that argument "oversimplifie[d] the analysis." *Id.* at 252.  The plaintiffs' arguments as to specific neighbors and lots fared no better.  The court concluded that the plaintiffs were not similarly situated to a neighbor with an undersized lot who was permitted to build because that neighbor only sought to expand her existing residence by 90 square feet, not build a new 3,000 square foot structure and install a large pool and deck.  The court held that "materially different projects may be treated differently by zoning or planning boards without raising constitutional concerns."  *Id.*; *see also Rondigo*, *L.L.C. v. Casco Tp.*, *Mich.*, 2009 WL 1362390, at *7 (6th Cir. May 13, 2009) (holding that the plaintiff, owner of land zoned for industrial use on which she sought to conduct commercial yard-waste composting operation, was not similarly situated with existing commercial composting facility because the existing facility had been operating since before composting standards were enacted and therefore was an exempt nonconforming use under the relevant ordinance); *Barstad v. Murray County*, 420 F.3d 880, 886 (8th Cir. 2005) (distinguishing the expansion of an existing use from the construction of a new facility); *Bell v. Duperrault*, 367 F.3d 703, 707–08 (7th Cir. 2004) (observing that the construction of new structures may be dissimilar from the replacement of existing structures).

In contrast to these cases, the court in *Eternal Investments*, *LLC v. City of Lee's Summit*, *Mo.*, 2007 WL 679883 (W.D. Mo. Mar. 1, 2007), found the similarly situated requirement met when a plaintiff landowner who was denied a zoning change submitted evidence of nearly identical landowners who received the change.  *Id.* at *4.  The plaintiff had applied to rezone a large tract from agricultural to residential to build a large single-family subdivision.  After a public hearing, the City Council voted 4-3 to deny the plaintiff's application.  The plaintiff compared its tract to

"other tracts of land which were created from the same farmland." *Id.* All of the tracts, including the plaintiff's, "were subject to the same private deed restrictions, all are relatively the same size (8-10 acres), all have access to and from new Todd George Parkway and are impacted by new Todd George Parkway, all have the same 12 inch water line along the west side of Todd George Road, all are located in the southwest quadrant of Scruggs and Todd George, all have low-density residential as their recommended land use, all property adjacent to the west line is zoned R-1, all were annexed at the same time (1964), had the same entity which owed the tracts and all sought the same benefit from the City." *Id.* The owners of each of these tracts had obtained approval for rezoning except for the plaintiff. The plaintiff moved for summary judgment on its class-of-one equal protection claim. The court granted the motion, holding that the plaintiff "met its burden" on the similarly situated prong and that there was no rational basis for the city's decision. *Id.*; *see also Sloup v. Loeffler*, 2008 WL 3978208, at *16 (E.D.N.Y. Aug. 21, 2008) (finding that the plaintiff, a commercial fisherman whose equipment was seized, met his burden of raising a fact issue as to whether another individual was "prima facie identical in all relevant respects" by presenting evidence that the plaintiff and the other individual had performed similar fishing activities in the same general area and should have been subject to the same equipment seizure); *Nat'l Council of Arab Americans v. City of New York*, 478 F.Supp.2d 480, 496 (S.D.N.Y. 2007) (denying the city's motion for summary judgment dismissing a class-of-one claim brought by a plaintiff who was denied an event permit because of the large size of the expected crowd and the lack of a rain-contingency plan while others received permits for the same venue for large crowds when rain was forecast; the plaintiff raised fact issues as to whether the plaintiff's proposed event "truly had an uncontainable size and lacked an adequate rain contingency plan" and as to "what measures were taken by other permitees, if any, to control turnout or publicize a rain contingency").

41

Applying these precedents to the undisputed facts disclosed in the record leads to the conclusion that the Lindquists have not raised a fact issue material to determining whether the individuals they identified as similarly situated used-car dealership license applicants – Chambers and the Nielsens – were similarly situated with respect to the ordinance. *See*, *e.g.*, *Beeler*, 328 F.3d at 817.  The differences are both factual and regulatory.

The material issues under the ordinance are the distance from each lot to existing used-car dealerships or residential areas and whether the lot was previously used as a car dealership and could qualify for exemption under the grandfather clause.  The City argues that differences in lot size and shape are also relevant.  The City points out that the lots at 4545 Spencer Highway and 2801 Preston Road are 46,696 square feet and 49,849 square feet, respectively, and rectangular in shape.  The Lindquist lot, by contrast, is 22,500 square feet and square in shape.  But the differences in size and shape are material only insofar as they bear on the ordinance distance requirements, the grandfather clause, and the City's purpose in passing the ordinance, to curb the growth of new dealerships and keep them away from residential areas.

As in *Unique Properties* and *Highland Development*, and unlike *Eternal Investments*, there are important factual differences between the plaintiffs and the comparators in this case.  The Lindquist lot and the Nielsen lot are different in their previous uses, the improvements, and their ability to be used for a purpose other than a car sales lot.  The previous use and the improvements on the lots are relevant to the ordinance's grandfather provision, which distinguishes between new and existing lots.  The Nielsen lot at 4545 Spencer Highway was previously used as a car dealership and had extensive improvements specifically built for a used-car dealership.  The Lindquist lot at 4646 Spencer Highway had been used as a gas station, was never operated as a car dealership, and did not have improvements designed for a used-car dealership.  As in *Cordi-Allen*, the Lindquists

would have to undertake new construction to equip the lot for use as a used-car dealership if their license appeal was granted.  The Nielsen lot was already set up as a dealership and did not require new construction, much less expansion of an existing use.  The Nielsens argued that their lot qualified for the exemption from 1,000-foot rule under the grandfather provision in the ordinance, based on the prior use.  The Lindquist lot also violated the 1,000-foot rule, but they did not assert that they qualified for exemption under the grandfather provision and nothing in the prior use of the lot fell within that provision.

Nor have the Lindquists raised a fact issue as to whether the Chambers lot is a sufficiently similar comparator.  Like the Nielsen lot, and unlike the Lindquist lot, the Chambers lot was equipped for, and had previously been used as, a used-car dealership.  The Chambers lot was denied an application based on the 150-foot rule, which was not an issue for the Nielsen or Lindquist lots.  The purpose of the 150-foot rule was to mitigate the "secondary effects" associated with used car dealerships and ensure a sufficient distance between dealer lots and residential areas.  The relevant lot characteristics are the distance to a residential neighborhood and the potential for secondary effects on residents.  Chambers argued to the City Council that the 150-foot rule should not be a barrier to granting his license appeal because none of the nearby residents objected to him reestablishing the lot as a used-car dealership.  Indeed, some neighbors welcomed the car dealership because the lot would no longer be vacant.  The Chambers lot was clearly different from the Lindquists' in terms of the relevant lot characteristics.

The differences among the Lindquist, Nielsen, and Chambers lots are regulatory as well.  Courts analyzing the similarly situated requirement in the context of municipal licensing and permits have concluded that there must be a *prima facie* showing that the applications and associated documentation are identical in material respects.  In *Campbell v. Rainbow City*, 434 F.3d 1306, 1314

(11th Cir. 2006), a developer sued the city after it denied approval for a proposed project to build residential apartments. *Id.* at 1309. The court concluded that a "showing that two projects were similarly situated requires some specificity," and held that the projects being compared "must be *prima facie* identical in all relevant respects." *Id.* at 1314. After reviewing the plaintiff's purported comparators, the court held that the developer failed to meet the "similarly situated" requirement. A similarly situated project that was "*prima facie* identical in all relevant respects" would be a plan to develop residential apartments, not a commercial or mixed-use plan, and would be essentially the same size, have an equivalent impact on the community, and require the same zoning variances. *Id.* at 1314, 1316 n. 8. It was not enough that the city had granted approval for several commercial or mixed-use projects as well as a 16-unit apartment complex when the plaintiff sought approval of an apartment complex containing 144 to 180 units. The court noted the lack of any evidence as to what documentation the alleged comparators had presented to the city in seeking approval of their projects. Without such documentation, the plaintiff did not show the similarity of the permit applications. *Id.*

The court in *Roma Outdoor Creations*, *Inc. v. City of Cumming*, *Ga.*, 599 F.Supp.2d 1332 (N.D. Ga. 2009), came to a similar conclusion. In that case, the court considered whether the plaintiff's application for a sign permit was the same in all relevant respects to other applications, including in the documentation presented to the city. *Id.* at 1343. The court held that the alleged comparator was not sufficiently similar because it had applied for a height variance while the plaintiff had applied for a separation variance. Although both applications "identified excessive height as the sole nonconforming feature of their proposals," there was no other evidence about the applications "beyond this superficial similarity." *Id.* The court held that it had to "consider all

44

aspects of the applications, including the documentation that the applicants presented in support of their requests." *Id.*

When a plaintiff's and the alleged comparators' applications are materially different, the similarly situated requirement is not met.  In *Purze*, 286 F.3d at 455–56, the plaintiffs sought to develop property by subdividing it into residential lots, which required the Village's approval.  The plaintiffs submitted a subdivision plat.  Some of the lots and the maintenance easements on the plat were smaller than required under the Village's zoning code.  The Village denied the application and the plaintiffs brought an equal protection challenge, alleging that other residential developers were treated more favorably.  The court granted summary judgment in favor of the Village, rejecting the plaintiff's comparisons to other developers because "the allegedly similarly-situated individuals . . . requested different variances than the [plaintiffs] requested; submitted their plats [for a subdivision] during different time periods; and had their plat requests granted by different and previous Boards."  *Id.* at 455; *see also Taylor Acquisitions*, *L.L. C. v. City of Taylor*, 313 Fed. Appx. 826, 836 (6th Cir. 2009) (concluding that two developers were not similarly situated when their proposals were considered by two differently-composed city councils and by two different mayors).

Similarly, in *Beeler*, 328 F.3d at 817, the plaintiff was denied a liquor permit while a neighboring business's permit was renewed.  The plaintiff brought an equal protection challenge against the city, alleging that there was no basis for the differential treatment.  He alleged that he was similarly situated to the other store because they were adjacent and sold the same kind of products.  The relevant ordinances prohibited the sale of beer and wine within certain distances of churches and schools.  The ordinances had a grandfather provision under which businesses applying for liquor permits only needed to satisfy the distance requirements in existence when the original

permit application was filed.  The court held that the plaintiff failed to meet the similarly situated requirement because "[w]hereas [plaintiff] was applying for a new permit, the [neighbors] were applying to renew an existing permit."  *Id.*  Because the plaintiff could not identify any other parties applying for new permits that were denied, the court granted summary judgment on the equal protection claim.  *Id.*  In *Sampson v. Town of Salisbury*, 441 F.Supp.2d 271 (D. Mass. 2006), the plaintiffs were not sufficiently similar to the alleged comparators with respect to their permit applications.  The plaintiffs built a home on a street next to wetlands and a tidal salt marsh.  Any building activity on their street required approval by the town's conservation commission.  The plaintiffs were concerned that future development on the adjacent lot would ruin the "view, privacy, and quality of life that induced them to build a home" on the street.  *Id.* at 273.  They considered purchasing the lot to ensure that nothing would be built on it.  Town officials allegedly assured the plaintiffs that the adjacent lot was "unbuildable."  *Id.*  A few months later, another couple, the Andrews, bought the lot with the intent to build a house.  They filed the required notice of intent to build with the conservation commission, submitted detailed plans, and subjected their plans to public hearing and review.  The commission allowed construction on the Andrews lot and the plaintiffs brought an equal protection challenge.  The court held that the plaintiffs and the Andrews were not similarly situated because "the Andrews filed the necessary applications with detailed plans, while the Plaintiffs, at best, informally inquired into the status of Lot 7."  *Id.* at 281.  The plaintiff landowners had not made a *prima facie* showing that their application and the Andrews application were identical in all material respects.

As in *Purze*, *Beeler*, and *Sampson*, the facts show that the Lindquists' license application and appeal was materially different from the Chambers and Nielsen applications and appeals.  The Chambers lot did not violate the 1,000 foot rule; the Lindquist lot did.  City officials had denied

Chambers his initial license application based on the 150-foot rule, which did not apply to the Lindquists. The 1,000-foot rule, the basis for the Lindquist denial, was not at issue in Chambers' appeal to the City Council. Chambers argued to the City Council that the 150-foot rule should not be a barrier to granting his license application because none of the nearby residents objected to him reestablishing the lot as a used-car dealership. Some neighbors welcomed the car dealership because the lot would no longer be vacant. The Lindquists had and made no such argument. Chambers also presented information to City Council that before he bought the lot at issue, he had received assurances from City officials that the lot was in compliance with the ordinance and was eligible for a used-car dealer license. In contrast, the Lindquists were expressly told by City officials before they purchased their lot that the property at 4646 Spencer Highway did not qualify for a used-car dealer license under the ordinance.

"In the land-use context . . . the most reliable comparisons are likely to be from roughly the same time frame." *Cordi-Allen*, 494 F.3d at 253. The Chambers license application, denial, and appeal occurred two years after the Lindquists' appeal was denied. The City Council had two different members, Ralph Riggs and Jackie Welch, in July and August 2006 when it heard Chambers' appeal, than in June 2004, when it denied the Lindquists' appeal. Like the alleged comparators in *Purze*, Chambers "requested different variances than the [plaintiffs] requested; submitted [his application] during different time periods; and had [his] request[] granted by [a] different . . . Board."

The record also shows significant differences between the Nielsens and the Lindquists in their license applications and appeals to the City Council. Although the Nielsens' application was initially denied based on noncompliance with the 1,000-foot rule, like the Lindquists' application, the Nielsens sought an exemption based on the grandfather provision in the ordinance. As in *Beeler*,

47

the ordinance distinguished between licenses for new operations and for previously existing operations.  The grandfather clause permits a license, despite noncompliance with the 1,000-foot rule, for a dealership operating at the same location and continuously licensed with no more than a sixty-day interruption of sales activity.  The ordinance did not define the term "sales activity."  Keith Nielsen argued for a broad definition, pointing to the minimum sale requirements to maintain an active car dealer license in the State of Texas.  He presented evidence of sales activity that satisfied that criteria and submitted the previous owner's active license to sell cars at 4545 Spencer Highway.  The Lindquists did not present any argument that they qualified for an exemption from the 1,000-foot rule under the grandfather provision.  Some City Council members stated that they did not agree with Nielsen and believed that the lot did not meet the grandfather provision.  But a majority of the City Council voted to grant the appeal and the ordinance does not require Council members to state the reason for their votes.  The record shows that the Lindquists' license application and appeal was not similar to the Nielsens' in all material respects.

In a case with analogous facts, a car dealer brought a class-of-one equal protection challenge because the city allowed another entity to operate a car dealership on a plot of land after previously denying the plaintiff the right to do so.  *Franklin v. City of Merriam*, 2008 WL 1884189, at *1 (D. Kan. Apr. 25, 2008).  The plaintiff had been interested in buying property to operate a car dealership and found a lot with a vacant fast-food restaurant on it.  Before buying the lot, he spoke with the city's Community Development Director, Paul Glaves, about putting a car dealership on the property.  Glaves, who would be responsible for drafting a report recommending that the city grant or deny the proposal, told the plaintiff that he supported the proposal but that he would be retiring soon.  There was evidence that the city agreed with the director's recommendation about nine out of ten times.  The plaintiff purchased the property on February 3, 2004.  The next day, he submitted

a zoning application to change the use of the property from a restaurant to a used-car dealership. Glaves wrote a report recommending approval, but he retired before a public hearing was held. The new Development Director, Dustin Smith, wrote a new report recommending denial of the plaintiff's proposal. Smith's reasons were that the restaurant had not been vacant for long, the city wanted to diversify its economy away from the automobile industry, and there had been no chance to pursue other restaurant options. At the public hearing in August 2004, the city council voted unanimously to deny the plaintiff's application. *Id.* at *2. Some council members stated that they wanted to see another restaurant at the location, and others had concerns about whether the lot was large enough for a used car dealership. *Id.* After the city council denied his application, the plaintiff sold the property to a real estate developer, who also bought the adjacent lot. On April 5, 2005, the developer applied for approval of a change of use for the restaurant lot and a change in zoning for the adjacent lot it had purchased. The developer wanted to put a used-car dealership on the combined lot. The developer's application was different from the plaintiff's because it included both lots, the layout was different, and the grading plan was different. Another Development Director, Dennis Enslinger, had replaced Smith in the interim. Enslinger wrote a report in December 2005 recommending approval of the developer's proposed plan. On January 23, 2006, the city council voted 5-3 to approve the developer's application. *Id.* at *3. One council member questioned whether it would be fair to allow the developer to use the property as a car dealership after having denied the opportunity to the plaintiff. Council members who voted in favor of the application stated that the developer's application was different because it used both lots instead of just the restaurant lot and because the restaurant lot had been vacant for a longer period. Two of the council members who voted to deny the developer's application stated that they did so for the same reasons they denied the plaintiff's. *Id.*

The plaintiff sued the city under a class-of-one theory and argued that he and the developer were similarly situated because "they both sought to use the same property in the same manner (i.e., as a car dealership)." *Id.* at *5. The court rejected this characterization of the similarities as "far too broad to satisfy the rigorous inquiry in class-of-one cases." *Id.* The court noted several important differences between the plaintiff and the developer. The developer's application involved not only the restaurant lot but combined two lots. The adjacent lot was zoned differently than the restaurant lot, meaning that the applications involved different zoning and use requests. The developer's application was submitted over a year after the plaintiff's. In the interim, the Development Director had changed and the restaurant lot had continued to be vacant. *Id.* The court concluded: "Simply put, the applications had only one thing in common: they sought to put a car dealership in an area where a restaurant once existed. This is not enough. The number of differences in the applications and the environment in which the applications were being considered defeat plaintiffs' attempt to show that they were similarly situated to [the developer]." *Id.* at *6.

In the present case, the numerous differences among the three lots at issue defeat the Lindquists' attempt to show that they were similarly situated to the Nielsens or to Chambers. The Nielsen lot was outfitted for and previously used as a car dealership. The Nielsens argued to the City Council that the grandfather provision exempted their lot from the 1,000-foot rule. The Lindquists did not make that argument and could not have because their lot was never operated as a car dealership. The Nielsen appeal was heard at a different time by different members of the City Council. The Chambers application was initially denied for noncompliance with the 150 foot rule, not the 1,000-foot rule. The Chambers appeal was heard two years after the Lindquist appeal, by a City Council with different members. As in *Franklin*, given the differences in the lots, "the applications [,] and the environment in which the applications were being considered," no rational

juror could find that the Lindquists' lot was sufficiently similar to the alleged comparators' lots in all respects relevant to the ordinance requirements and the City Council's decision.

### 3. A Rational Basis

In a related argument, the Lindquists assert that because all three lots violated the ordinance distance requirements and the City Council was incorrect in applying the grandfather clause to the Nielsen lot and in exempting the Chambers lot, the three applicants were similarly situated and the City acted irrationally in denying the Lindquist appeal while granting the Nielsen and Chambers appeals.

Under a rational-basis review, a court affords governmental decisions a "strong presumption of validity," and will uphold a governmental decision "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe by Doe*, 509 U.S. 312, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993). "[T]he range of rational grounds is not restricted to those articulated at the time the [government] made its decision," but encompasses all conceivable bases, actual or hypothesized. *Reid v. Rolling Fork Pub. Utility Dist.*, 854 F.2d 751, 754 (5th Cir. 1988). "As long as there is *a* conceivable rational basis for the official action, it is immaterial that it was not *the* or *a* primary factor in reaching a decision or that it was not actually relied upon by the decisionmakers or that some other nonsuspect irrational factors may have been considered." *Id.* (emphasis in original). The "decision of a governmental body does not violate equal protection guarantees if there is any basis for the action that bears a debatably rational relationship to a conceivable legitimate governmental end." *Reid v. Rolling Fork Public Utility Dist.*, 979 F.2d 1084, 1087 (5th Cir. 1992). "Rational basis review is an extremely lenient standard of review; therefore '[a]ttacks against zoning ordinances under this test are rarely successful.'" *Baker v. St. Bernard Parish Council*, 2008 WL 4681373 (E.D. La. 2008) (quoting *Wood Marine*

*Service*, *Inc. v. City of Harahan*, 858 F.2d 1061, 1066 (5th Cir. 1988)).

A decision "can be considered irrational" only when the decision-maker "acts with no legitimate reason for its decision." *Harlen Associates v. Village of Mineola*, 273 F.3d 494, 500 (2nd Cir. 2001) (quotation marks and citation omitted). The inquiry for the second-prong of a class-of-one claim is very narrow. "*Olech* does not empower federal courts to review government actions for correctness." *Bizzarro v. Miranda*, 394 F.3d 82, 89–90 (2d Cir. 2005). The *Olech* inquiry focuses on whether the challenged action or decision was rationally related to the government's work or mission. *Id.* "[D]ecisions that are imprudent, ill-advised, or even incorrect may still be rational." *Rossi v. West Haven Bd. of Ed.*, 359 F.Supp.2d 178, 183 (D. Conn. 2005); *see also Smith v. City of Chicago*, 457 F.3d 643, 652 (7th Cir. 2006) (holding that "an incomplete, inadequate, or inaccurate explanation" for the government's decision in a class-of-one case "will not equate to a lack of rational basis-otherwise 'the federal courts would be drawn deep into the local enforcement of . . . state and local laws.'") (quotation omitted). "Even if the court is convinced that the political branch has made an improvident, ill-advised, or unnecessary decision, it must uphold the act if it bears a rational relation to a legitimate governmental purpose." *Cash Inn of Dade*, *Inc. v. Metro. Dade Cty.*, 938 F.2d 1239, 1241 (11th Cir. 1991). Rational basis review is "a paradigm of judicial restraint" and "[w]here there are 'plausible reasons' for [the government decision], '[the] inquiry is at an end.'" *FCC v. Beach Communications*, *Inc.*, 508 U.S. at 314 (quotation omitted); *see also Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 672, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) ("the Equal Protection Clause is satisfied if we conclude that the California Legislature rationally could have believed" that the measure promoted its objectives) (emphasis in original).

The Lindquists argue that the City's decisions fail this test because there is no rational basis

for the City Council's decision to grant the appeal for the Nielsens and for Chambers but not for the Lindquists.  They contend that there is no legitimate state interest in unbridled discretion to grant an appeal when an applicant does not comply with the ordinance.  According to the Lindquists, the City Council's decisions lack a rational basis because they were not based on the ordinance's requirements for a used-car dealer license.

As evidence of the lack of rational basis, the Lindquists point to the City's Rule 30(b)(6) representative's deposition testimony that he was unaware of any facts that justified the different results in the three licensing decisions at issue.  The Lindquists argue that this testimony was among the topics noticed for the deposition and binds the City because the notice asked the City to provide a witness to testify about "applicable criteria, standards or requirements; documents or other information considered regarding; communications relating to; and all bases for decisions on application or non-application of [the] Ordinance to used car dealerships proposed for 4545 Spencer Highway, 4646 Spencer Highway, [and] 2801 Preston Road."  (Docket Entry No. 55, at 24).  A Rule 30(b)(6) deposition is admissible against the party designating the representative but is not "binding" on the entity for which the witness testifies in the sense of preclusion or judicial admission. CHARLES A. WRIGHT *ET AL.*, FEDERAL PRACTICE & PROCEDURE § 2103 (2d ed. 1994).  Rule 30(b)(6) does not bind an entity to its designee's recollection unless it shows that contrary information was not known or unavailable.  Testimony given in a Rule 30(b)(6) deposition is evidence, which, like other deposition testimony, can be contradicted and used for impeachment purposes.  *See A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001); *see also Diamond Triumph Auto Glass, Inc. v. Safelite Glass*, 441 F.Supp.2d 695, 723 n.17 (M.D. Pa. 2006) (rejecting the plaintiff's argument that the court should limit the defendant to the testimony of its corporate representative simply because "the witness could not answer the questions"; the plaintiff never filed a motion to

compel or a motion for sanctions and "[t]he Federal Rules of Civil Procedure do not allow such a severe sanction under these circumstances").  While this court considers the Rule 30(b)(6) witness's testimony that he was unaware of the basis for the difference in treatment, that testimony must be viewed in the context of the other record evidence of the City's basis for denying the Lindquist appeal while granting the Nielsen and Chambers appeals.

The City argues that the numerous differences between the Lindquists and the Nielsens and Chambers provide a rational basis for the City Council's decisions to grant the Nielsens and Chambers a license but deny one to the Lindquists.  The lack of similarly situated comparators will often provide a rational basis for the difference in treatment.  *See Neilson*, 409 F.3d at 104 ("The similarity and equal protection inquiries are . . . virtually one and the same . . . in a 'class of one' case."); *Walker v. Exeter Region Coop. Sch. Dist.*, 284 F.3d 42, 44 (1st Cir. 2002) ("Decisions may sometimes use the similarly situated language to conflate the two inquiries-by pointing to a differentiating characteristic so self-evidently a basis for a reasonable classification as to show both dissimilarity and reasonableness at the same time.").

In *Harlen Associates*, 273 F.3d at 501, the court found that differences between the plaintiff and the alleged comparators were sufficient to provide a rational basis for the difference in treatment.  In that case, a landowner applied for a special use permit to operate a convenience store on a busy highway near three schools.  The village zoning board unanimously denied the application. The board's primary concern was that the convenience store would entice children to use a dangerous highway crosswalk.  The landowner, emphasizing that the village had granted permits to other convenience stores, sued the village, alleging a violation of its equal protection rights.  The court held that protecting the safety of schoolchildren was a rational basis for the village's decision.  *Id.* at 500.  The other convenience stores located on the highway were not as

54

close to the schools as the location in question.  The court held that this difference alone was enough to provide a rational basis for the village to treat the plaintiff's application differently.  *Id.* at 500–01.  The landowner asserted that the board's safety concerns were not supported by written studies, and that the true reason for the denial was the opposition of nearby residents.  The court, however, refused to find that the board's failure to commission a written study would make the permit denial arbitrary.  *Id.* at 501.  The village's decision would be considered arbitrary only if it had no basis in fact.  The court pointed to undisputed testimony in the record that the crosswalk adjacent to the proposed convenience store was particularly dangerous.  *Id.*

A town's "need to facilitate seasonal rentals" was a rational basis for excluding island properties from the rental registration requirements imposed on mainland properties in *Nasca v. Town of Brookhaven*, 2008 WL 4426906 (E.D.N.Y. Sep. 25, 2008).  In that case, the plaintiff owned a rental property located on the mainland portion of the town.  A town ordinance required a rental permit for all non-owner occupied residential rental properties, other than those located on the island portion of the town.  The plaintiff argued that the ordinance violated his equal protection rights and brought a class-of-one claim.  The court observed that the island portion was a "seasonal/vacation community," and thus differed from the mainland portion, which was a "year-round community." *Id.* at *12.  The ordinance requiring a rental permit was passed to "promote the health, safety and welfare of residents and visitors" on the island.  *Id.*  In passing the ordinance, the town recognized "the unique characteristics of Fire Island communities" and adopted the ordinance "to encourage the most appropriate use of land throughout said communities."  *Id.*  The court rejected the plaintiff's claim, holding that the differences in occupancy patterns, as well as economic considerations, provided a rational basis for excluding the island rental properties from the rental permit requirement.  *Id.*

55

And in *Roberts v. Village of Shorewood*, 2002 WL 1331999 (N.D. Ill. June 17, 2002),  the plaintiff failed to establish that the village acted irrationally by passing an ordinance that limited new permits for home day-care operators to outfits with 12 or fewer children.  For several years, the plaintiff operated a day care under a license that permitted her to have 16 children in the home.  She bought a lot to build a new home and continue to operate the day care at the new location.  After the plaintiff bought the lot, the town amended the applicable ordinance.  The town granted the plaintiff a permit for her new home but, consistent with the amended ordinance, limited the permit to 12 children.  In ruling on the equal protection challenge, the court first determined that the plaintiff could not point to any comparator who was *prima facie* identical in all relevant respects, because all of the individuals who were granted permits operated day care centers with fewer than 13 children.  *Id.* at *6.  With respect to rational basis, the court observed that many residents near the plaintiff's new home favored limiting in-home day care to fewer than 12 children or even prohibiting it outright.  *Id.* The court held that "[w]hile fears about possible effects on property values or increases in traffic may have been inaccurate, they cannot be found irrational" and "Village officials did not act irrationally . . . by, in part, making a decision based on this opposition."  *Id.*

One question raised by the record is whether the City Council's decision to grant the Nielsen and Chambers appeal, while denying the Lindquist appeal, resulted from an inaccurate view of what the ordinance required or permitted.  The ordinance does not state that the Council may grant a variance, exception, or waiver to the distancing requirements.  On appeal, the applicant bears the burden to show that the license application meets the ordinance's requirements.  The City Council must decide, *de novo*, whether the applicant meets the requirements.  However, during the three appeals at issue in this case, City Council members and the Mayor from time to time referred to the Council's ability to grant a "variance" to the distance requirements.  Tietjens, the City Planning

Director, stated at the beginning of each appeal hearing that "this is a not a variance. . . . It is a section in the ordinance that's allowed those who have made such application.  It is of public record and everyone that gets rejected is able to make the same appeal.  Each appeal stands on its own merits. Council has discretion to grant or refuse as you deem appropriate." (Docket Entry No. 59, Ex. C, at 4:16–25).  In response to a discussion about the Nielsens "losing" the grandfather provision, Tietjens stated, "But again, there is Section 22-29(b) which allows the council to deliberate on specific appeals." (*Id.*, at 27:23–25).  He further stated that the Council "should consider the specific attributes that run with the property or that are with that property in your deliberations." (*Id.*, at 26:25–27:2).  One Council member stated in the Nielsen hearing, "I think each case stands on its own.  Each request for its variance stands on its own, and this has no dealing on anybody else. . . . I think this property is best suited as a car lot and I think we need to go ahead with it and allow this variance." (*Id.*, at 41:23–42:1).  Near the end of the Nielsen hearing, another Council member stated that the Council was not being asked to rule on a variance, but an appeal, and that he struggled with the idea of overruling the ordinance on an appeal.  Immediately after that statement, the issue was put to a vote and Council voted 5-3 to approve the Nielsen appeal.

During the Lindquist appeal hearing, one Council member stated that there had been confusion about variances and "the law of the land."  Tietjens clarified that the Lindquists were not appealing the denial of a variance but a rejection of their license application for noncompliance with the distance requirements.  Even after this clarification, one Council member stated during the Lindquist hearing: "All appeals or variances are not treated the same, and we do have a right to do that.  We have the right to overrule an appeal.  We have the right to make a variance." (Docket Entry No. 59, Ex. D, at 16:2–5).

At the outset of the Chambers appeal hearing, Tietjens reiterated that the hearing was not to

decide a variance request, but the appeal of the denial of the Chambers license application for noncompliance with the 150-foot rule.  One Council member stated that he would consider voting for a "variance" if none of the nearby residents objected.  Another member asked if the Council had "given anyone else a variance" for the 60-day requirement in the grandfather clause.  (Docket Entry No. 59, Ex. E, at 25:17–19).  Tietjens replied, "We did, yes, sir."  (*Id.*, at 25:20).  The same Council member then asked if the Council had "given anyone else a variance that was close to residential property," to which Tietjens responded, "No, sir." (*Id.*, at 25:25–26:2).  Later in the hearing, Mayor Manlove stated:  "[W]e as a city, as a governing body, do have the ability to allow a variance.  That gives us flexibility within our laws which is a very good thing.  You cannot have a law necessary to fit every single situation.  And this may very well be a good opportunity to allow a variance in this case."  (*Id.*, at 49:16–23).

Even if several members of the City Council were confused by or misunderstood the appeal process and the distinction between an appeal and a variance, the record does not raise a fact issue as to a lack of a rational basis.  Courts have upheld decisions applying zoning and permit laws even when the decisionmaker was incorrect in applying those laws. *See*, *e.g.*, *Jeneski v. City Of Worcester*, 476 F.3d 14, 17 (1st Cir. 2007) (finding that a rationally based decision does not violate equal protection simply because it violates a state statute) (quoting *Stern v. Tarrant County Hosp. Dist.*, 778 F.2d 1052, 1054 (5th Cir. 1985)); *Henry Co. Homes, Inc. v. Curb,* 548 F.Supp.2d 1281 (N.D. Fla. 2008) ("The decision to deny building permits based on failures in the subdivisions, even if found to not comport with the language of the subdivision guarantees or the regulations as stated at the time, were not so far afield as to be deemed irrational.").

"The pertinent question in a constitutional claim is not whether the defendants correctly understood the rules they were enforcing." *Bizarro*, 394 F.3d at 88.  "Rather, an *Olech*-type equal

protection claim focuses on whether the official's conduct was rationally related to the accomplishment of the work of their agency." *Id.* at 88–89. In *Bizarro*, the plaintiffs were corrections officers who brought a class-of-one claim alleging that the defendants violated their equal protection rights by disciplining them after the plaintiffs did not assist an internal corrections department investigation. *Id.* at 83–84. The plaintiffs' supervisors had asked them to deliver contraband to an inmate who was serving as an informant and they refused. *Id.* The corrections department code of conduct stated: "A peace officer employee shall cooperate in any internal or official investigation by the Department, truthfully answer all questions, and submit any required written report with such investigations . . . ." *Id.* at 84. The plaintiffs argued that the defendants had no rational basis to file disciplinary charges because the plaintiffs did not violate this rule. They argued that the rule only compelled cooperation when the officer himself is a target of the investigation or has witnessed misconduct. The plaintiffs contended this view was the prevailing understanding of the rule and that the defendants knew the rule's limitations. The court rejected this argument, concluding that "*Olech* does not empower federal courts to review government actions for correctness." *Id.* at 88–89. The court held that because encouraging cooperation with internal investigations is a legitimate interest of the corrections department and because the rule could be construed to require the cooperation the defendants sought, it was not irrational – even if it was incorrect – for the defendants to discipline the plaintiffs under this rule. *Id.* at 89.

In the present case, the undisputed facts in the record show material differences between the Lindquists and the Nielsens and Chambers with respect to their lots, applications, and appeals to City Council. The evidence showed that the Nielsens' proposed dealership at 4545 Spencer Highway was "new" in the sense that they personally had not operated a car dealership at that address. But the Nielsens argued that they qualified for an exemption from the 1,000-foot rule under the grandfather

clause.  The Lindquist lot violated the 1,000-foot rule; they did not qualify under the grandfather clause and did not argue that the exemption applied; and they knew before buying the lot that it was not eligible for a license under the ordinance.  It was not irrational for City Council members to believe that the Nielsens' appeal should be granted under the purpose of the grandfather clause.  The fact that some members disagreed does not make the decision irrational.  Like the defendants in *Bizarro*, whether the City Council correctly understood the rules it was applying is irrelevant.  As in *Harlen Associates* and *Nasca*, the City Council's decision to grant the Nielsen appeal was rationally related to the legitimate interest behind the ordinance and its grandfather clause.  The Nielsen lot had been a used-car dealership and would not be a "new" dealership to the City.  It is not irrational – even if it may be inaccurate or incorrect – for the City Council to have concluded that the Nielsens qualified for a license based on the grandfather provision.   The court's duty to determine whether a defendant has offered a rational basis for the difference in treatment "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *FCC v. Beach Communications*, *Inc.*, 508 U.S. at 313.  It was rational for the City Council to decide that the Nielsen lot should be given a license under the grandfather clause.  The lot was last used as a licensed car dealership and the length of time it had been vacant was disputed; the prior owners had spent approximately $800,000 to improve the lot for the specific purpose of operating as a car dealership, making it a "showcase lot," the most recently updated used-car dealership in Pasadena; and the lot was so committed to use as a car dealership that it had no other practical purpose.  (Docket Entry No. 59, Ex. C, Transcript of May 18, 2008 City Council meeting, at 11:11–20; 13:23–25).  The City Council had a legitimate interest in allowing the owners to continue operating the lot as a car dealership as opposed to having it remain vacant.  Tietjens, the City's planning director, warned the City Council about ad valorem taxes not being paid for the lot at 4545 Spencer Highway.  The record shows that some City Council

members believed that granting the Nielsen appeal would produce more tax revenue than leaving the lots vacant.  It was not irrational to grant the Nielsen appeal on that basis while denying the Lindquist appeal.  The Lindquists had no similar arguments about their lot.  After their appeal was denied, they were able to use their lot to sell "classic" cars and other vehicles.

The evidence also showed that the Lindquist and Chambers license application denials and appeals were based on different ordinance provisions.  The City had a rational basis to treat Chambers differently.  The provision at issue in the Chambers lot was the 150-foot provision, not the 1,000-foot provision.  The 150-foot rule was intended to allay residents' concerns about the increased traffic congestion, lights, and noise associated with a nearby used-car dealership.  Chambers obtained the consent of all nearby homeowners to operate a dealership at 2801 Preston Road, even though he was technically not in compliance with the 150-foot rule.  Granting the appeal was consistent with the ordinance purpose of allaying the concerns of the neighbors.  *Cf. Roberts*, 2002 WL 1331999, at *6 (the city did not act irrationally by basing decision to deny permit, in part, on nearby resident opposition).  Based on these differences, the City's decision to grant Chambers's license application was not irrational or arbitrary.

Even if the City did not articulate a purpose or rationale to support its decisions, a challenged "[g]overnmental action only fails rational basis scrutiny if no sound reason for the action can be hypothesized."  *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005); *see also Unruh v. Moore*, 2009 WL 1310981, at *2 (5th Cir. May 12, 2009) ("To pass muster under rationality review, the plaintiff must rule out all possible reasonable justifications for disparate treatment, not merely the justification provided by the government official.").  "[T]he 'actual' reason provided by the [government] is immaterial."  *Unruh*, 2009 WL 1310981, at *2.  In addition to the differences explained above, there are other "reasonably conceivable" justifications for the differential treatment.

61

City Council members were concerned about the City official's oral assurance to Chambers that he would be able to operate a used-car dealership on the lot at 2801 Preston Road. The record shows that one Council member was concerned that the City might be liable for the oral assurance Chambers had received before buying the lot that it qualified for a used-car dealership license. It would not be irrational or arbitrary for the City to grant the Chambers appeal on this basis while denying the Lindquist appeal because they did not receive or rely on any such assurance in purchasing their lot. To the contrary, the Lindquists were told by City officials before purchasing the lot that they could not operate a used-car dealership there.

The past use of the Nielsen and Chambers lots, the assurance given to Chambers before he bought his lot, and the other evidence in the record show that the Lindquists were not similarly situated to the Nielsens and to Chambers and that there was a rational basis for the decision to deny the Lindquist appeal but grant the Nielsen and Chambers appeals.

The City's actions satisfy rational basis review. The Lindquists have failed to meet their "heavy burden of 'negativing any reasonably conceivable state of facts that could provide a rational basis' for their differential treatment." *Lindquist*, 525 F.3d at 387. The record discloses several rational bases for the City's decisions to deny the Lindquist appeal but grant the Nielsen and Chambers appeals.

### 4.  Intentional Discrimination

Even assuming that the Lindquists satisfied the requirement to show that the City acted irrationally or arbitrarily in denying the Lindquist appeal while granting the Nielsen and Chambers appeals, their class-of-one equal protection claim would still fail. The Lindquists have not raised a fact issue as to whether the City intentionally treated them differently than the Nielsens or Chambers.

The record raises the possibility that the City Council's decision to grant the Nielsen and

Chambers appeal, while denying the Lindquist appeal, resulted from an inaccurate view of the appeal process and the belief that the City Council had the power to grant a variance when it did not.  But there is no evidence that the City Council intentionally relied on the supposed variance power to single out the Lindquists and deny their appeal.  The "right to make a variance" was mentioned at all three appeal hearings.  The City Council based its decisions in each case on the history and the present use of the lots and the applicants' arguments for exemption from the ordinance's requirements.  Nor is there evidence that the City Council intentionally ignored the ordinance requirements so that the Nielsens or Chambers could receive a license.  The mistaken belief about the Council's power to grant a variance actually attenuates any inference of intent to ignore the ordinance.  The fact that some members of the City Council may have erroneously believed that they had the power to grant a variance to the Nielsens or Chambers because their lots met the spirit – but not the letter – of the ordinance, is not a denial of equal protection.  "Mere error or mistake in judgment when applying a facially neutral statute does not violate the equal protection clause.  There must be intentional discrimination."  *Rickett v. Jones*, 901 F.2d 1058, 1060–61 (11th Cir. 1990); *Olech*, 528 U.S. at 565 (singling out must be "intentional"); *Cernuda v. Neufeld*, 307 Fed.Appx. 427, 433, 2009 WL 117581, at *5 (11th Cir.2009) ("The fact that administrators in certain areas may have made errors in the application of the regulations does not mean that the correct evaluation made in [plaintiff's] case violates the Equal Protection Clause."); *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001) (to prove an equal protection violation, plaintiffs must establish that they "received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent"); *Gibb v. City of Friendswood*, No. 07-329, 2007 WL 4326739, at *4 (S.D. Tex. Dec. 6, 2007) (explaining that "a mistake by the City official in applying the exception is simply not a violation of the Fourteenth Amendment" because "negligence rarely

rises to the level of a constitutional violation").  "Even arbitrary administration of a statute, without

purposeful discrimination, does not violate the equal protection clause."  *E & T Realty v. Strickland*,

830 F.2d 1107, 1114 (11th Cir. 1987); *see also Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 88

L.Ed. 497 (1944) ("The unlawful administration by state officers of a state statute fair on its face,

resulting in its unequal application to those who are entitled to be treated alike, is not a denial of

equal protection unless there is shown to be present in it an element of intentional or purposeful

discrimination."); *Gates v. Sicaras*, 706 F.Supp. 169, 174 (D. Conn. 1989) ("The equal protection

clause does not provide a cause of action for every misapplication or arbitrary application of state

law.").  "The requirement of intentional discrimination prevents plaintiffs from bootstrapping all

misapplications of state law into equal protection claims."  *Id.*

        In the absence of evidence of purposeful or intentional discrimination, courts have rejected

class-of-one equal protection claims even when there was evidence that the government decision may

have been incorrect or arbitrary.  In *E & T Realty*, the plaintiffs alleged that members of the county

commission violated the equal protection clause by denying their application for an increased sewer

allocation while allowing other individuals to increase their sewage.  830 F.2d at 1108.  The county

had imposed a moratorium on connections to the sewer system, with an exception allowing only

reconnections that would not use any more water than the most recent former use.  *Id.*  E&T Realty,

a commercial landlord, requested permission to relocate existing plumbing fixtures to provide for the

water needs of a potential tenant, asking for a sewer allocation of at least 800 gallons per day (g.p.d).

The county denied the application, indicating that it would only approve 448 g.p.d., the most recent

former usage amount for the building.  The potential tenant then leased space from a different

landlord, who had been approved for a 5,130 g.p.d limit.  *Id.*  E&T Realty brought an equal protection

claim against the county commissioners.  After a bench trial, the district court found in favor of E&T

Realty, concluding that there was no rational basis for granting the 5,130 g.p.d to one applicant and

denying the 800 g.p.d. requested by E&T Realty. *Id.* at 1109. The court of appeals reversed, holding

that it was error for the district court to conclude that "plaintiffs proved an equal protection violation

merely by showing an arbitrary and irrational difference between the results of two particular

applications of a facially neutral statute." *Id.* at 1112. The court held that "even if E&T Realty and

Joseph were similarly situated, the fact that defendants treated them differently would not establish

an equal protection violation absent proof that defendants acted with discriminatory intent." *Id.* at

1113. In a footnote, the court addressed a situation similar to the present case:

> Appellants have not cited, and we have been unable to discover, any
> cases finding an equal protection violation when plaintiff applied for
> and was denied a government benefit, the denial was proper under the
> terms of a facially neutral and otherwise valid statute which leaves
> little or no discretion to the decisionmaker, and plaintiff complains
> that someone else was granted a similar benefit contrary to the statute.
> We do not address the thorny issue of whether an equal protection
> violation can ever be shown under such circ[u]mstances. If it can,
> plaintiff must certainly prove purposeful discrimination in order to
> prevail.

*Id.* at 1114 n.8. The court remanded the case to the district court with instructions to "determine

whether defendants purposefully discriminated against plaintiffs." *Id.* at 1114.

Similarly, in *Bernard v. Village of Hinsdale*, 411 F.Supp.2d 965, 966 (N.D. Ill. 2006), a

landowner brought a class-of-one equal protection claim after the Village denied him a permit to

build a second residence on property he had purchased. The property was made up of two lots of

record. The landowner, Bernard, intended to tear down the one existing house on the property and

build a new house on each of the two lots. He informed the village of his plans. A village official

responded to his letter, explaining that the property was considered a single zoning lot under the

village's zoning code. At an appeal hearing before the zoning board, Bernard argued that another

individual, Scopu, had received permits to build two houses on a property that was substantially similar to his.  Some members of the board stated that Scopu's case was "procedurally and substantively distinguishable."  *Id.* at 967.  The zoning board affirmed the village official's determination by a 3-2 vote.  After filing suit in federal district court, Bernard argued that the evidence supported a finding of intentional discrimination because it was "clear that the Village and its officials were acting intentionally when they issued Mr. Scopu . . . two building permits and when they denied Mr. Bernard his right to build on lot 10."  *Id.* at 968.  The court rejected this argument, holding that mere knowledge of likely consequences is insufficient to prove a violation of equal protection.  *Id.* at 968–69.  The court cited cases for the proposition that a government official "'intends' a consequence when he acts because rather than in spite of it."  *Id.* (citing *Tuffendsam v. Dearborn County Bd. of Health*, 385 F.3d 1124, 1127 (7th Cir. 2004)).  Because there was no evidence that the zoning board had ignored the zoning laws or that its decision was not made in good faith, Bernard had failed to establish an equal protection violation.  The court also addressed Bernard's argument that the decision to grant Scopu's permit was incorrect, concluding that "[i]f defendants in good faith erroneously granted Scopu a permit, the equal protection clause does not mandate that they repeat that mistake for Bernard."  *Id.* at 969.

The relationship between intentionality and illegitimate animus has not been well-developed in the case law.  Although the Fifth Circuit has held that the Lindquists are not required to prove that the City Council acted with illegitimate animus or ill will for their class-of-one claim, such a claim requires a showing of intentional discrimination.  The Supreme Court in *Olech* recognized that an equal protection claim can be brought by a "'class of one,' where the plaintiff alleges that she has been *intentionally* treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Olech*, 528 U.S. at 564 (emphasis added); *see also Washington v.*

*Davis*, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (requiring proof of discriminatory intent in equal protection cases); *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944) ("The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.").  Without the requirement that a difference in treatment be intentional, any error or mistake by a government official would constitute a violation of the equal protection clause.  *See Kendrick v. Carlson*, 995 F.2d 1440, 1447 (8th Cir. 1993) ("[A] plaintiff asserting an equal protection violation based on unequal application of a facially neutral statute must show intentional discrimination . . . . Were the rule otherwise, if government decisionmakers 'erroneously applied [a statute] in a single case, they could never again apply it correctly without violating equal protection.'") (citations omitted) (quoting *E & T Realty*, 830 F.2d at 1114).

"[I]ntentionality is an ambiguous concept, shading at one end into mere knowledge of likely consequences and at the other into a desire for those consequences." *Tuffendsam v. Dearborn County Bd. of Health*, 385 F.3d 1124, 1127 (7th Cir. 2004).  Mere knowledge of likely consequences is insufficient to prove an equal protection violation.  *See Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) ("'Discriminatory purpose' implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of' . . . its adverse effects upon an identifiable group.").  The record shows, as a matter of law, that the City Council's intent was no more than knowledge of likely consequences.  The record shows that the City Council was aware that it had granted the Nielsens' appeal when it decided to deny the Lindquists' appeal and that the City Council had identified differences between the Lindquist lot and the Nielsen lot.  But there is no

67

evidence that the City Council intentionally singled out the Lindquists and decided to deny them a license while granting the appeals for Chambers and the Nielsens.  If the City Council "in good faith erroneously granted [the Nielsens] a permit, the equal protection clause does not mandate that they repeat that mistake for [the Lindquists]."  *See Bernard*, 411 F.Supp.2d at 969; *see also Seven Star*, *Inc. v. United States*, 873 F.2d 225, 227 (9th Cir. 1989) ("[E]qual protection principles should not provide any basis for holding that an erroneous application of the law in an earlier case must be repeated in a later one.").  The record shows that the City Council acted in good faith by considering the arguments for why each of the three lots fell within the exemptions to the ordinance's distance requirements and by basing its decisions on the history and characteristics of the lots.  Even if some City Council members mistakenly believed that they could grant a variance to Chambers or the Nielsens, that does not show intentional discrimination.  As the City points out, the Lindquists had previously received a variance to the 150-foot rule from the City Council for their other lot on Preston Road, further attenuating any inference of intentional disparate treatment.  (Docket Entry No. 59, Ex. G).  The record does not raise a fact issue as to whether the City Council intentionally singled the Lindquists out for disparate treatment, as required for a violation of equal protection.

The Lindquists have failed to show that, as a matter of law, the City exercised unbridled discretion in refusing their appeal while granting others.  Even if the City Council did not follow all the ordinance requirements, they clearly followed the purpose of the ordinance and the grandfather provisions.  The Lindquists have failed to raise a genuine fact issue material to determining whether the City intentionally treated them differently from other similarly situated persons without a rational basis.  Although the City Council's decisions may seem unfair or unwise in hindsight, "[t]he *Olech* class-of-one suit serves a narrow, although important, function.  It is not a vehicle for federalizing run-of-the-mine zoning, environmental, and licensing decisions." *Cordi-Allen*, 494 F.3d at 254.  This

court grants the City's motion for summary judgment and denies the Lindquist's motion for partial summary judgment.

**IV.    Conclusion**

      The Lindquists' motion for partial summary judgment is denied.  The City's motion for summary judgment is granted.  Final judgment is entered by separate order.

      SIGNED on September 10, 2009, at Houston, Texas.

_____

Lee H. Rosenthal

United States District Judge
